1                    **UNITED STATES DISTRICT COURT**
                      **WESTERN DISTRICT OF NEW YORK**
2

UNITED STATES OF AMERICA          )
3                                 ) Case No. 6:17-CR-6016
                                  ) Case No. 6:17-CR-6017
4                                 )          (CJS)(JWF)
                 Plaintiff,       )
5                                 )
vs.                               ) February 15th, 2017
6                                 )
RICHARD L. WILBERN,               )
7                                 )
                                  )
8                 Defendant       )

9

10            **TRANSCRIPT OF DETENTION HEARING**
        **BEFORE THE HONORABLE JONATHAN W. FELDMAN**
11             **UNITED STATES MAGISTRATE JUDGE**

12   <u>APPEARANCES</u>:

13   For the Plaintiff:   JAMES P. KENNEDY, JR.
                          ACTING UNITED STATES ATTORNEY
14                        BY:  DOUGLAS E. GREGORY, ESQ.
                          ASSISTANT UNITED STATES ATTORNEY
15                        100 State Street, Suite 500
                          Rochester, NY 14614
16
     For the Defendant   FEDERAL PUBLIC DEFENDER'S OFFICE
17   Richard L. Wilbern: BY:  ANNE BURGER, ESQ.
                          ASSISTANT FEDERAL PUBLIC DEFENDER
18                        28 East Main Street
                          First Federal Plaza, Suite 400
19                        Rochester, NY 14614

20   Audio Recorder:       DEBORAH ZAMITO

21   Transcriber:         MEGAN E. PELKA, RPR
                          Robert H. Jackson Courthouse
22                        2 Niagara Square
                          Buffalo, NY 14202
23

24
             Proceedings recorded with electronic sound recording,
25   transcript prepared by computer.

1

2

3        WITNESSES                                              PAGE

4        DEFENDANT

5        GARY SKUSE, Ph. D.
             Direct Examination by Ms. Burger              37
6            Cross Examination by Mr. Gregory              51
             Redirect Examination by Ms. Burger           58
7

8        DEFENDANT                                              PAGE

9
             Exhibit A CV of Gary Skuse, Ph. D.           40
10           Exhibit B Articles                           49
             Exhibit C Articles                           49
11           Exhibit D Articles                           49

# I N D E X

# E X H I B I T S

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              THE CLERK:  This is 17-CR-6016 and 17-CR-6017.

 2              THE COURT:  Good afternoon.  We're here for a

 3   detention hearing with respect to Mr. Wilbern.

 4              I just want to place on the record what I have.  I

 5   have a memorandum from the government regarding the

 6   government's detention motion with respect to both

 7   indictments, although it's -- the filing number is the 6017

 8   indictment.  I have the government's response and a reply by

 9   the defendant.

10              I also have a letter from Ms. Burger regarding some

11   personal history and characteristics of the defendant, dated

12   yesterday, that was faxed to my chambers, which I have

13   reviewed.  It also contains a CV of Gary Skuse, Dr. Skuse and

14   I have an abbreviated Pretrial Services report, which just

15   contains the criminal history of the defendant.  It's my

16   understanding that defense did not want the defendant

17   reviewed -- or interviewed by Pretrial Services?

18              MS. BURGER:  Yes, that's correct.

19              THE COURT:  Okay.  Then, are we -- did I get

20   everything?  Are we ready to proceed?

21              MS. BURGER:  You didn't mention the initial filing,

22   document 17, but I think that the Court referenced having

23   received it when we were last together.

24              THE COURT:  What was that now?

25              MS. BURGER:  Document 17.  That was the initial
```

1    affirmation relating to --

2          THE COURT:  Oh.  Right.  Right.  Okay.  Yep.  All

3    right.  So, I think we have two indictments.  So, I'd like to

4    go in order, starting with 17-CR-16 and hold the detention

5    hearing as to that.

6          MR. GREGORY:  Judge, it would be our intention,

7    really, because a lot of the same circumstances and facts

8    which would support detention would apply to both.

9          THE COURT:  Okay.

10         MR. GREGORY:  I think it makes sense, with the

11   Court's permission, to articulate our basis for detention with

12   regard to both of those charges.

13         THE COURT:  Any objection?

14         MS. BURGER:  I don't have an objection, but I think

15   that -- I intend to make an argument with respect to

16   indictment ending 6 that under some new Supreme Court case

17   law, the 922(g) charged in that indictment does not qualify as

18   a crime of violence for the purposes of the Bail Reform Act.

19   So, with that understanding, I don't have any objection to

20   handling them together.

21         THE COURT:  Okay.  Then, the government may proceed.

22         MR. GREGORY:  Thank you, Judge.  Just for the record,

23   the government is moving for the pretrial detention on both

24   indictments pending before this Court pursuant to Title 18,

25   United States Code, Section 3142(f)(1)(A), because the

1    offenses charged, as I see it, that is, the 2003 armed credit

2    union robbery resulting in the shooting death of Raymond

3    Batzel and the 2016 unlawful possession of a firearm by a

4    convicted felon are both, categorically, a crime of violence.

5    Certainly 922(g) has been shown to be a crime of violence in

6    the 2nd Circuit.

7            I would also move, under Title 18, United States Code

8    Section 3142(f)(2), as I believe that the facts and

9    circumstances of this case indicate that the defendant poses a

10   serious risk of flight.  I would also rely on the statutory

11   rebuttable presumption that in these types of cases there are

12   no -- no conditions or combination of conditions which would

13   assure the appearance of the defendant as required and the

14   safety of the community.

15           With regard to the first (g) factor, the nature and

16   circumstances of the crime, as the Court is now well aware, on

17   August 12th, 2003, at approximately 9:45 a.m., Richard Wilbern

18   entered the Xerox Federal Credit Union.  He was wearing a dark

19   blue, long-sleeved nylon jacket with the letters FBI written

20   in yellow across the back and on the sleeve.  He wore dark

21   sunglasses and a poorly-fitting, Afro-style wig.

22           He was also carrying a large briefcase and a green

23   colored umbrella.  He also had a United States Marshals badge

24   hanging on a chain around his neck.  Witnesses also described

25   that he was wearing a bulletproof vest.

1          Once inside the bank, Wilbern proceeded almost

2   directly into a cubicle occupied by a female employee.  And

3   once inside her cubicle, he sat in a chair, he placed the

4   umbrella in front of him on the desk of the employee and he

5   maintained the briefcase at or near his feet.  Wilbern then

6   explained to the employee, in sum and substance, that he was

7   there to conduct a security assessment and to stage

8   essentially, a robbery.

9          This led to some additional conversation with a

10   female employee who gave a bit of push back and asked more

11   pertinent questions -- asking more pertinent questions as to

12   the identity -- the true identity of this individual.

13          At that point, Wilbern reached down and removed two

14   firearms from the briefcase.  And at that point, according to

15   the witness, his attitude completely changed.  One of the

16   firearms was described as a handgun and the other as a sawed-

17   off rifle or shotgun.  He also removed from that same bag

18   another bag, which he ultimately instructed the female

19   employee to take, walk to the front counter and fill the bag

20   with money.

21          While the employee walked towards the counter,

22   Mr. Wilbern began to lay employees down inside of the bank.

23   There were also customers inside the bank.  After laying two

24   people down in an office, Mr. Wilbern confronted Raymond

25   Batzel, a customer of the credit union, who had just finished

1  a transaction at the teller stand.  According to the

2  witnesses, Batzel refused to lie down.  He refused to go where

3  he was instructed to go, which caused Mr. Wilbern to raise the

4  firearm, which is captured on the video, shooting Mr. Batzel

5  in the neck, severing his spine and essentially causing

6  massive internal damage, which resulted in his almost

7  immediate death.

8         At the same time that that shooting occurred, another

9  customer was entering the credit union and upon seeing what

10 had just transpired, turned and tried to flee from the bank.

11 Upon seeing that, Mr. Wilbern then turned his aim towards that

12 individual and shot him in the back as he was running outside

13 of the bank.

14        After shooting both of these customers, Mr. Wilbern

15 quickly returned to the teller counter and he told the credit

16 union employees to fill the bag with cash.  Mr. Wilbern was

17 able to obtain approximately $10,000 in cash, which he put it

18 inside the briefcase.  He then took that bag, that briefcase,

19 and he fled the credit union.

20        But in his haste to leave the bank, he forgot to

21 retrieve the umbrella that he initially brought into the

22 credit union and that umbrella was still lying on the

23 employee's desk, the same location he placed it when he first

24 walked into the employee's cubicle.  And in the aftermath of

25 that incident, the umbrella was secured as evidence.

1          With regard to the 3142 (g) factors -- (g)(2)

2    factors, I would submit there exists compelling evidence which

3    demonstrates the defendant's participation in this crime.  And

4    I think some of the examples of the proof that the government

5    is in possession of will demonstrate just that.

6          I'll start with the umbrella left at the scene.  In

7    August 2003, the umbrella was swabbed for the presence of DNA.

8    Sterile swabs were used to take two sets of samples from

9    certain locations on the umbrella.  Long story short, while

10   DNA was detected, given the testing kit filled at that time at

11   the Monroe County lab, no DNA profiles were able to be

12   obtained.

13         We then fast-forward to 2011 when a -- the second set

14   of swabs obtained from that umbrella, from those various

15   locations, was transferred to the Office of the Chief Medical

16   Examiner in New York City.  By 2011, OCME had been utilizing

17   low copy number testing for approximately six years after

18   being accredited to do so by the New York State Commission on

19   Forensic Science in 2005.

20         As to the swab taken from the umbrella wraparound

21   closure, OCME determined that there was a mixture of DNA

22   located at that location from at least two people.  However,

23   OCME further determined that a full, 15-loci DNA profile could

24   be generated and that a major contributor of the DNA could be

25   identified.

1          In August of 2016, OCME compared the 2011 DNA full

2     profile of the major contributor to the known DNA profile of

3     Mr. Wilbern and it resulted in a match at all 15 loci

4     positions.  According to OCME, the probability of finding that

5     match again in the general population was more than one in

6     6.8 trillion people, or about 1,000 times the population of

7     the planet Earth.

8          As to the second location, which was described as the

9     umbrella latch mechanism, OCME was able to determine that this

10    was a single-source contributor, that is, only one person

11    contributed to the DNA which was located at this location.  In

12    this case, they were able to obtain a partial DNA profile at

13    ten loci, still a very significant number of loci and all of

14    which were consistent with the DNA profile found on the

15    umbrella wraparound closure and also with the known DNA

16    profile of Mr. Wilbern.

17         Given that ten loci match, OCME determined that the

18    probability of finding that match again in the general

19    population was one in 138 million people or approximately one

20    of two people living in the United States.  Now, there's no

21    question -- and we've already seen it, Judge, with the

22    submissions -- that we will argue the admissibility the DNA in

23    this case.  We've already started that process.

24         But I would note, just as a general observation, it's

25    worthy to note that the DNA match, which was obtained by OCME,

1   did not come back to some random person living, say, out in

2   Sayville, New York or Plattsburgh, New York.  Rather, it was a

3   match to a man with a criminal background, that already

4   included an armed bank robbery, here in Monroe County.  It was

5   a match to a man who was previously convicted of possessing a

6   sawed-off shotgun.  But more importantly, it was a match to a

7   man with significant and undeniable ties to the Xerox

8   Corporation in Webster, New York.

9          For example, there is no question that Richard

10  Wilbern was very familiar with the expansive Xerox Campus in

11  Webster, New York.  He was employed at Xerox with a hire date

12  of August 11th, 1997, although he worked there earlier as a

13  temporary employee since September of 2006 (sic).  He worked

14  in Building 200, which is located just north of the Xerox

15  Credit Union, Building 304.  And what has admittedly been

16  derived from some 20/20 hindsight, it very clear that the

17  defendant was a disgruntled and agitated Xerox employee.

18         In August of 2000, while employed at Xerox, Wilbern

19  brought a lawsuit against Xerox, alleging that Xerox

20  unlawfully discriminated against him, subjected him to a

21  hostile work environment, failed to hire him for a position

22  for which he applied, solely based upon his race.

23         Mr. Wilbern was then fired in February of 2001 for a

24  number of employment-related reasons which prompted him to add

25  to his civil lawsuit, which remained pending, claiming that

1    Xerox retaliated against him for complaining about Xerox

2    discriminatory practices.  All of those claims would

3    ultimately be dismissed in December of 2002 by Federal Court

4    Judge Mike Telesca, for failing to state a claim upon which

5    relief could be granted.

6         Not only was Mr. Wilbern familiar with Xerox and the

7    Webster Xerox Campus, he was also very familiar with the

8    credit union which, again, is housed within Building 304, in

9    which, if you're not an employee, can be a very difficult

10   location to find.

11        For example, credit union records show that

12   Mr. Wilbern maintained an account at the Xerox Federal Credit

13   Union.  He maintained his account at Xerox from roughly May

14   of 1998 through August 2004.  Not only were his paychecks

15   direct deposited, but records show he'd been inside the

16   Building 304 on numerous occasions.

17        For example, bank records obtained from 2002 and 2003

18   show that Wilbern presented himself personally at the Building

19   304 branch.  He appeared there on September 13th, 2002, but

20   then not again until seven months later, after his lawsuit was

21   dismissed.  Starting on April 9th, 2003, right through

22   July 29th, 2003, which was just two weeks before the robbery,

23   Mr. Wilbern was personally inside Building 304 of the Xerox

24   Federal Credit Union making transactions, including making

25   small cash deposits or depositing money in order to receive

1  cashier's checks; Seven different occasions from April through

2  the end of July 2003.  What is very curious is that after the

3  robbery occurred on August 12th, 2003, all the way up until

4  his account was closed for insufficient funds in August 2004,

5  there is no record of Mr. Wilbern ever going back inside

6  Building 304.

7          Now, it's public knowledge that a citizen's tip

8  directed law enforcement towards Mr. Wilbern and that occurred

9  in 2016.  And since that tip was generated, both before and

10  after Mr. Wilbern's arrest, state, local and federal

11  investigators have done their due diligence in terms of

12  corroborating, locating additional witnesses and unearthing

13  additional evidence in this case apart from, obviously, what

14  is key DNA evidence.

15          Just by way of example, I do anticipate that there

16  would be, as witnesses called by the government, several

17  individuals who were very close and familiar with Mr. Wilbern.

18  More particularly, they were each very familiar with

19  Mr. Wilbern and the way he appeared in August of 2003.  I

20  expect testimony from several of those individuals, in

21  addition to the actual tipster, to positively identify Richard

22  Wilbern as the man who is depicted in the bank surveillance

23  photographs.

24          I also expect testimony from witnesses who will

25  testify that Mr. Wilbern was in possession of a knockoff FBI

1    jacket, both prior to and well after the robbery.  And there

2    will likely be testimony with regard to where and when that

3    FBI jacket and the U.S. Marshals badge were purchased.

4         Most notably, I anticipate specific testimony that

5    the defendant had previously worn that poorly-fitting Afro

6    wig, as he did the day he committed the robbery, on other

7    occasions, perhaps to cover up the short, dreadlocked hair

8    that he had at that time that was growing -- at that point in

9    his life.  Those same short dreadlocks were clearly evident in

10   his booking photo on January 6th, 2004 when he was arrested in

11   the State of Ohio.

12        THE COURT:  Say that last one again.

13        MR. GREGORY:  The same short dreadlocks that I

14   referred to are clearly evident in the photograph, a booking

15   photo, which was taken on January 6th, 2004 when he was

16   arrested in the State of Ohio.  I do have that picture if the

17   Court would like to see it.

18        THE COURT:  Okay.

19        MR. GREGORY:  The umbrella has also provided us with

20   additional information, other than simply being an item which

21   hosted the defendant's DNA.  When the umbrella was first

22   secured as evidence, the technician made a note that all of

23   its labels were in Chinese or in Japanese.  As it turns out, a

24   Japanese linguistic expert that we've retained has indicated

25   that the labels and markings are entirely in the Japanese

 1   language.  For example, the labels indicate the umbrella was

 2   made in Japan.  One label stated fancy umbrella in Japanese

 3   characters.  And another label listed the name of the

 4   distributor, the merchandiser as Wakamatsuya, all in Japanese

 5   symbols.  Other than the word crane, there are no other

 6   English characters on the umbrella; it's entirely in Japanese

 7   characters.

 8        One of the sticker's labels also contain the name of

 9   a popular tourist destination called Shiba Shina (phonetic),

10   which is a shortened form of the name Shiba Daijingu, a well-

11   known Shinto Shrine and tourist attraction located in Shiba

12   Park in Minato Ward of Tokyo, Japan.

13        So, how could Mr. Wilbern possibly get his hands on a

14   Japanese umbrella from Minato Ward in Tokyo, Japan?  Well,

15   U.S. Customs and Border Patrol have indicated to us in the

16   years leading up to the August 2003 robbery, Mr. Wilbern spent

17   quite a lot of time in the country of Japan.  In fact, from

18   August 1997 to August 2002, Mr. Wilbern traveled to Tokyo,

19   Japan on at least 14 different occasions.  He even traveled

20   there with his son Rayard (phonetic) in April of 1999.

21        Mr. Wilbern took time off from work at Xerox and told

22   several of his coworkers that he was over there conducting

23   business.  We've also been able to establish that the business

24   that he was conducting was drug dealing, drug distribution and

25   money laundering.

1          THE COURT:  Wait.  Before you move on from the

2    umbrella, the stickers that are on the umbrella are stickers

3    that were placed on the umbrella after it was purchased or

4    were on the umbrella at the time it was purchased?

5          MR. GREGORY:  We have no way of knowing that.  We

6    just know that when they were found lying on the desk of the

7    employee, it had all the stickers on it.

8          THE COURT:  Okay.  And was the umbrella sold within

9    the United States?

10          MR. GREGORY:  We have not been able to determine.

11   Again, it's all Japanese markings.  It appears that it was

12   sold in Japan.

13          THE COURT:  And when you say appears, it's based on

14   the stickers?

15          MR. GREGORY:  The merchandiser information indicating

16   Wakamatsuya, which according to our linguistic expert, the ya

17   at the end of Wakamatsu indicates that that would be a store.

18          THE COURT:  All right.

19          MR. GREGORY:  I expect, Judge, that there will be

20   testimony from witnesses who will indicate that during that

21   time period, Mr. Wilbern and several other associates from

22   Philadelphia, Pennsylvania and potential suppliers in the area

23   of San Diego, California, all participated in an ongoing

24   scheme to transport and distribute narcotics from the

25   United States to Tokyo, Japan, where they were able to

 1    generate large profit margins.  On most of the occasions when

 2    the group traveled to Japan they stayed at a hotel called the

 3    Asia Center of Japan, which is located in the heart of the

 4    Minato Ward in Tokyo.

 5            But what is even more important, I think, for the

 6    Court's consideration in terms of bail, is that not only was

 7    Mr. Wilbern allegedly involved in laundering proceeds and

 8    distributing narcotics, but that Mr. Wilbern made all of these

 9    trips out of the country while he was under probation

10    supervision, yet he never informed any probation officer that

11    he was doing that.

12            As the PSR notes on page three in detailing the

13    criminal history, the defendant was arrested in Chesterfield,

14    Virginia on May 1st, 1992.  We've been able to secure the

15    probation records from Virginia.  After serving a short prison

16    sentence for traffic and larceny charges, he began his

17    supervision on May 17th, 1993 upon his release from

18    confinement.

19            His supervision was then transferred to Richmond,

20    Virginia on July 14th, 1993.  The Virginia records indicate in

21    their CHRONO notes that, "The subject's supervision by our

22    Richmond office remained fairly uneventful until he failed to

23    contact their office earlier this year.  And as a result of

24    this, his home was visited on March 9th, 1995.  Upon visiting

25    the home, the officer observed that the house appeared vacant.

1   Additionally, the subject's telephone had been disconnected.

2   The subject failed to report to the district office on January

3   4th, 1995; February 1st, 1995 and March 1st, 1995.

4   Thereafter, a Show Cause Order was issued on March 27th, 1995,

5   stating that Wilbern had absconded from supervision and that

6   his whereabouts were unknown."

7           We skip ahead to late 2000, where, apparently, the

8   defendant responded to the Show Cause Revocation Order in

9   which the Richmond Court, at that time, ordered that the

10  defendant's previously suspended sentence be revoked and that

11  the Court sentenced him to a period of incarceration of five

12  years, but that the Court resuspended that term of

13  incarceration and again placed him on probation.  The Court

14  then, because it appeared that the defendant was living in

15  New York, authorized the transfer of his Virginia probation to

16  the State of New York.

17          On November 16th, 2000, the New York State Division

18  of Probation approved the transfer and began supervision of

19  the defendant by the Monroe County Probation Department.  On

20  January 2nd, 2001, the Monroe County Probation Department sent

21  a letter to Virginia, indicating that the Monroe County

22  Probation Department would provide courtesy supervision

23  effective immediately and the Monroe County CHRONO notes

24  indicate that Wilbern met with his probation officer and went

25  over the terms and conditions of that probation.

1            According to the probation officer, Mr. Wilbern was

2    granted travel for the following dates:  June 22nd, 2001 to

3    June 27th, 2001 to Chapel Hill, North Carolina to drive his

4    son to a basketball camp; June 30th, 2001 to July 2nd, 2001 to

5    Salisbury, Connecticut to drive his son to play for a summer

6    school; July 11th, 2001 to July 12th, 2001 to Salisbury,

7    Connecticut to visit a school where the son attends and July

8    8th, 2002 to July 9th, 2002 and July 26th, 2002 and July 27th,

9    2002 to drive his son to Robert Morris College to take him to

10   a basketball camp and then, in August 2002, to pick him up.

11           At no point was he ever granted permission by Monroe

12   County Probation to go to the country of Japan.  Yet, without

13   that permission, he traveled to Japan in February 2001,

14   April 2001, June 2001, October 2001, December 2001, March 2002

15   and August 2002.  On September 19th, 2002, Mr. Wilbern -- his

16   term of probation ended without probation ever knowing that he

17   had left the country.

18           By September 2002, the defendant was, in fact, off of

19   supervised release or probation and he was living in Fairport,

20   New York, but his finances were anything but stable.  For

21   example, for a variety of reasons, the Japanese drug

22   trafficking experiment was over.  After August of 2002, he

23   never traveled there again and lost that stream of disposable

24   income.  He had already lost his job at Xerox and was, at

25   best, making some money doing temporary work or participating

1    in clinical medical trials all across the country, as well as

2    receiving aid from the Department of Social Services.  In

3    November 2002, in an application for family assistance through

4    Monroe County, he indicated that he had no job and no food.

5    One month later, in December of 2002, his federal lawsuit

6    against Xerox seeking monetary damages was dismissed by Judge

7    Telesca and any hope to receive any money from that lawsuit

8    was extinguished.

9           In January 2003, Wilbern completed another

10   eligibility questionnaire through Monroe County DSS.  And in

11   that application, he stated that he had no income, had a

12   growing son, gas bills, et cetera.  He also wrote the word

13   "desperation" on his application.  In March 2003, he was sued

14   by the RG&E for failure to pay roughly $2,167.  IRS tax

15   records indicate that in 2002, he claimed an adjusted gross

16   income of $11,629 and that in 2003, he claimed taxable income

17   of just $4,982.

18          Add to all of that financial stress, his son, Rayard,

19   had earlier that year been accepted into the Winchendon

20   School, which is a private New England boarding school located

21   in Winchendon, Massachusetts.  Rayard actually matriculated

22   into the school in the Fall of 2003.  The problem for

23   Mr. Wilbern is that Winchendon came at a yearly cost of

24   $32,850.

25          The problems were only compounded when he was advised

1   by Winchendon that his son was only going to be given

2   financial aid for a third of it, a $10,000 grant and that he

3   would be responsible for the balance.  In a faxed letter he

4   sent from the Kinko's store located at 821 Fairport Road, he

5   told the school that Rayard, "must start.  Then, I can work on

6   it and I will, hook or crook, by the end of the year pay the

7   balance."  Two days later, the school emailed Mr. Wilbern

8   indicating that he would get $10,000 in aid, but he would have

9   to pay $22,850.

10          I would submit, Judge, that by the end of the summer,

11  when his son was headed off to Winchendon, the defendant was

12  in financial dire straits and had every reason to commit a

13  bank robbery.

14          Now, I can't stand here, Judge and provide an

15  acceptable answer to the Batzel family, or anyone for that

16  matter, why it was that law enforcement was not able to solve

17  this case sooner.  But regardless of when the crime was

18  solved, the fact remains that Mr. Wilbern was capable of

19  violence then and I would submit that he remains a very

20  dangerous person even now.

21          Why do I say that?  Well, on September 27th, 2016, in

22  the aftermath of his arrest on the credit union charges and

23  based upon a court-issued search warrant, law enforcement

24  searched 23 Tubman Way, where Mr. Wilbern stayed with his

25  girlfriend Ferran Scott and her mother, along with two young

1    children, including his own.  According to Ms. Scott, the

2    defendant was in and out of town, but when he was in town, he

3    would stay at her house.  The defendant was permitted to store

4    some of his personal belongings in Ms. Scott's garage,

5    including furniture, clothes and other items.  All of these

6    items he had previously maintained at a property located at

7    766 Hudson Avenue in the City of Rochester.

8         When agents searched the garage and they located his

9    belongings, they located an organizer-type notebook, which,

10   when opened, contained a full-face, black ski mask.  They also

11   located four semi-automatic rifles.  They located a 9-mm

12   rifle, semi-automatic, which was loaded with 25 rounds.

13   According to the owner of this gun, this gun was stolen

14   approximately ten years ago.

15        They found a Norinco SKS-type rifle.  That, too, was

16   loaded with 11 rounds of 7.62x39 caliber ammunition.  They

17   located an SAA Model SA-15 semi-automatic rifle and they

18   loaded -- located a Kel-Tek Model Sub -- Sub-2000, which is a

19   .40 caliber Smith and Wesson rifle.  They also located three

20   empty magazine clips, all of which were located in a gun case.

21        As the complaint in this case stated in -- we've

22   obtained additional sworn testimony.  Both the defendant's

23   girlfriend and her mother have indicated that the items that

24   were located in the garage belonged to the defendant; that he

25   was the only person that was permitted to store items in their

1   garage and that the guns certainly did not belong to them and

2   had they known the guns were there, particularly with two

3   young children in the house, they would have had them removed.

4        I mentioned that the defendant moved many of his

5   personal belongings from 766 Hudson Avenue to his girlfriend's

6   residence for storage.  Why did he do that?  Well, 766 Hudson

7   Avenue was previously owned by the defendant, having purchased

8   the property in January of 2008.  766 Hudson Avenue is a

9   commercial property with a restaurant on the first floor and

10  an office/living space upstairs.

11       Since he took over the property in 2008, Wilbern

12  allegedly failed to pay almost $31,000 in property taxes,

13  resulting in a tax lien being placed on the property.  By

14  March 2015, the property was lawfully foreclosed upon and the

15  property was sold to a Florida-based company, American Tax

16  Funding, who later sold it to a Rochester-based company called

17  SCR Development in February of 2016.

18       As of that date, SCR Development became the lawful

19  owner of the property and all of its contents and its

20  fixtures.  SCR Development entered the property in March of

21  2016, changed all of the locks and began the process of

22  rehabilitating the property, so that they could flip it and

23  sell it.

24       None of this sat well with Mr. Wilbern.  In fact, he

25  commenced a lawsuit against both American Tax Funding and

1    SCR Development in May of 2016.  And in that lawsuit, he

2    claimed, among other things, fraud and unlawful eviction.

3    That case, I believe, remains pending.  But what's interesting

4    is that Mr. Wilbern's personal affidavit, that he filed in

5    support of his civil complaint, states that even after the

6    foreclosure occurred in March of 2015, where his ownership

7    rights were lawfully extinguished, he nevertheless continued

8    to occupy and maintain the premises, even through March of

9    2016, as he alleges in his documents.

10         Why is that important?  Well, in March of 2016, when

11   SCR went into the premises to clean it out and secure it and

12   change the locks, they did, in fact, find Mr. Wilbern's

13   personal property.  They noted that the downstairs was a

14   restaurant, but it had obviously not been in -- not been used.

15   It hadn't been operating.  And the upstairs area, where

16   Mr. Wilbern's personal items were located, SCR employees

17   located a number of things.  I'm not going to detail

18   everything that was found at this point, only the things that

19   I think are relevant for your consideration on dangerousness.

20         But they did find paperwork, mail and other items

21   belonging to the defendant.  They found an assortment of

22   clothes and jackets in a freestanding armoire.  They found

23   literally hundreds of rounds of various caliber ammunition,

24   both boxed and loose.  They found several gun holsters.  They

25   found several empty ammunition clips.  They found two full-

1   torso bulletproof vests.  They found a Diamond tactical long

2   gun body holster for a long gun.  They found full-face ski

3   masks and camouflage masks.  And they found a loaded

4   Remmington 12-gauge shotgun.

5         The point, I guess, I'm trying to make here, Judge,

6   is with regard to the information at both Tubman Way and

7   766 Hudson Avenue, is that this defendant, a convicted felon,

8   remains, even to this day, a very dangerous convicted felon

9   with clear access to high-powered weapons, ammunition and body

10  armor.

11        I'll sum up with this.  Given the facts of the

12  underlying case, which clearly involve the most violent type

13  of crime imaginable and given the recent possession of several

14  loaded weapons, ammunition, ski masks, body armor, holsters,

15  God knows what Mr. Wilbern was up to or what he was planning.

16  I would respectfully suggest that this might indicate, to a

17  reasonable person, that the defendant is still very capable of

18  committing a similar act or similar acts and no amount of

19  money or houses that could be put up can ameliorate that.

20        Anyway, given everything that I've proffered, Judge

21  and in light of the life sentence the defendant would face if

22  he was convicted as well as his poor track record under

23  supervision, I would respectfully submit that there are no

24  conditions or combination of conditions which would reasonably

25  assure the presence of the defendant as required and the

 1  safety of this community.  Thank you.

 2       THE COURT:  Thank you.  Ms. Burger?

 3       MS. BURGER:  Thank you.  Before I begin my formal

 4  remarks, I have to say I'm somewhat surprised that there isn't

 5  additional direct evidence that the government has somehow

 6  been able to come up with in light of the problems with their

 7  DNA evidence.

 8       The very idea that Mr. Wilbern is accused of these

 9  serious offenses, based on what I can now hear from the

10  government's proffer, is a purely circumstantial case, based

11  on this DNA evidence.  It's our position that -- that this

12  Court is in, I think, an even stronger position to consider

13  releasing Mr. Wilbern on conditions.

14       THE COURT:  Let me interrupt for a second, because

15  maybe I missed it, but -- or maybe I misheard it -- but I

16  thought Mr. Gregory said that he has several witnesses who

17  will testify that Mr. Wilbern is the man in the bank

18  surveillance photographs.

19       MS. BURGER:  Well, perhaps I heard it a little

20  differently than you did, Judge.  The way I heard it --

21       MR. GREGORY:  I can tell you exactly what I said.

22       THE COURT:  Okay.

23       MR. GREGORY:  I do anticipate that there will be

24  witnesses who will affirmatively identify the defendant as the

25  person who is depicted in the photo.

 1          MS. BURGER:  So, then your people are going to say,

 2   oh, I'm looking at this video, this two-dimensional image of

 3   the robbery of the credit union.  I recognize the person

 4   depicted in that image.  These are not people who are saying,

 5   I was there, I saw Richard Wilbern.  That's not going to be

 6   the case from what the government's proffer is.

 7          And then, we're going to have people who apparently

 8   did not come forward for more than a decade, perhaps including

 9   the Monroe County probation officers who supervised

10   Mr. Wilbern for a number of years, in terms of time in close

11   proximity to when the robbery occurred; presumably none of

12   them came forward.  Other people from the community knew

13   Mr. Wilbern as a long-time employee at Xerox.  We don't have

14   people in that context who came forward in a timely fashion.

15          What we have, it sounds like, if I'm -- a lot of this

16   I'm hearing for the first time from the government, because we

17   have not received much substantive discovery yet, sounds to me

18   to be sort of prior bad act type evidence.  The references to

19   drug trafficking were a very long time ago.  And it's unclear

20   if the government is offering someone in the drug case, some

21   inducement to somehow implicate Mr. Wilbern from the pictures

22   in the bank.  I mean, I heard a lot of sort of prior bad act

23   404(b) type claims that I would imagine wouldn't be admissible

24   at a trial in the Xerox allegations in any event.

25          But I think if we come back to what the lynchpin of

1   their case is in the complaint, it's the DNA.  And the most

2   disturbing fact that I've been able to uncover, having nothing

3   more than that 20 or 30 pages of the DNA results, none of the

4   actual technical reports, the testing protocols in this

5   particular case that were done.  What I found is, the

6   Department of Justice, at the very time when these samples

7   were being analyzed in New York City, was taking a polar

8   opposite position from the position that Mr. Gregory's office

9   is taking today.

10          And in that case, they took the position that low

11  copy number DNA testing was highly unreliable, to the point

12  that they fought tooth and nail in another Federal Court, in

13  another part of the country, to have a judge prohibit a

14  defendant from having evidence be tested in an effort to prove

15  that defendant's innocence.  That is something that I haven't

16  heard anything from -- with the government; how the Department

17  of Justice, in one instance, can say a particular technique is

18  reliable and in another instance say the very same technique

19  is completely unreliable.

20          And I think that speaks volumes; that that's not what

21  the Court heard the government comment on today during their

22  proffer.  Instead, it was a lot of this 404(b) type

23  information.  You know, I think other factors that -- that the

24  Court may not be aware of, to read the complaint, very one-

25  sided picture of the government's case.  Reading it, one would

1    have no idea that there were any questions, whatsoever, about

2    the reliability of this particular type of DNA testing, in

3    spite of the fact the Department of Justice, in 2011, took the

4    position that it was highly unreliable and should never be

5    used.

6         What the Court may also not be aware of is that in

7    the few reports we've received so far, witnesses in the

8    immediate aftermath of the robbery did not provide one height

9    for the perpetrator of the robbery, for this subject in the

10   FBI jacket.

11        Instead, we have witnesses in the reports we've

12   received so far, saying that the perpetrator was anywhere from

13   roughly, if I remember correctly, five foot, seven to six

14   foot, six or six foot, seven.  But to read the complaint, the

15   government presents a picture that almost -- almost as if the

16   height that was provided uniformly was six foot which,

17   coincidently, it says is Mr. Wilbern's height.

18        If you look at some of these witness statements,

19   there's a huge discrepancy between the age of the perpetrator,

20   as described by actual witnesses who were in the credit union

21   at the time of the robbery, as compared with Mr. Wilbern's age

22   at the time.

23        You hear Mr. Gregory talk about how all the hopes of

24   recovering in his lawsuit against Xerox were lost when the

25   case was dismissed.  That is flatly untrue when you look at

1   the docket sheets of the case.  The case was immediately up on

2   appeal.  And even at the time of the robbery at Xerox, the

3   case was still pending, on appeal, at the 2nd Circuit.  That

4   case was not closed.  It was not a situation where all hope

5   was lost.

6            And incidentally, in doing a quick search on other

7   discrimination cases against Xerox in the same -- roughly the

8   same timeframe, I found lots of discrimination lawsuits,

9   approaching 100, that were pending at any given time against

10  Xerox, raising all kinds of age, race, sex discrimination.

11  This is not unique to Mr. Wilbern.

12           With respect to the government's proffer that

13  Mr. Wilbern was consistently in the bank making suspiciously

14  small deposits suspiciously small transactions, I've not seen

15  anything in the discovery we've received so far that indicates

16  any of the tellers or any of the personnel from the bank

17  indicated that the person was at all familiar to them as a --

18  as a frequent customer or someone who was coming into the bank

19  on a frequent basis.

20           With respect to the umbrella, I think the Court had

21  its finger on that problem with the umbrella in that there's

22  no confirmation the umbrella wasn't sold any place outside of

23  Japan.  To get to some of the legal issues in the case, it's

24  our position that in spite of the *Dillard* case from the 2nd

25  Circuit, which a number of years ago concluded that 922(g) was

1   a crime of violence, that this Court is not confined by the

2   *Dillard* ruling, in light of the *Johnson* case that came out in

3   2015.  It was that Supreme Court case where the Supreme Court

4   held unconstitutionally vague the clause in ACCA that it is,

5   for all practical purposes, identical to the crime of violence

6   definition in the Bail Reform Act.

7          And our position is, as a result, that the Court does

8   not have the authority to consider detaining Mr. Wilbern for

9   purposes of a crime of violence in conjunction with the 922(g)

10  offense.

11         THE COURT:  Well, the *Johnson* case was decided a bit

12  ago.  Is there any case --

13         MS. BURGER:  2015.

14         THE COURT:  Yeah.  Is there any case that's held

15  that?

16         MS. BURGER:  There have been other cases that have

17  applied *Johnson* to the guidelines and also to the Bail Reform

18  Act.  There's one -- I believe, it was a Hobbs Act.

19         THE COURT:  Are you referring to any case where the

20  922(g) was applied?

21         MS. BURGER:  Specifically in -- in our circuit, no.

22         THE COURT:  In any circuit?

23         MS. BURGER:  Nothing from the circuit.  There's been

24  some chatter in terms of district court activity, but nothing

25  that would be, I think, even persuasive for this Court.

```
 1          THE COURT:  Okay.  But you're aware of no case,

 2   district court, circuit court, which would support your

 3   position that the crime of violence determination for 922(g)

 4   is no longer proper?

 5          MS. BURGER:  Well, I mean, let me add that there were

 6   other circuits that did not agree with Dillard.  And so, if I

 7   recall correctly, the 4th Circuit may have been one of them

 8   that -- those circuits, for many years, have held that 922(g)

 9   is not a crime of violence.  And so, those circuits would not

10   have had to adjust their case law and that may have something

11   to do with why there isn't any appellate -- and there's

12   nothing that would, I think, be compelling or persuasive for

13   this Court, but I'm asking the Court to consider not applying

14   the crime of violence for the 922(g) count here.

15          With respect to the bail package that we've proposed,

16   we've proposed -- proposed a $50,000 bond, the majority of

17   which is secured by property and vehicles.  As I think the

18   Court gleaned, probably from my submission, every family

19   member who has pledged a bond is either a lifelong resident of

20   Rochester or has a long-term history of living here in the

21   past.  They own property.  They have long-term histories of

22   employment.  They are the most stable of people.  They are

23   willing to activate electronic monitoring and/or GPS at the

24   Court's pleasure.

25          And two stable homes with family members have been
```

1   proposed as potential residences, should the Court release

2   Mr. Wilbern on conditions.  He could be supervised by U.S.

3   Pretrial Services.  I've indicated and agreed upon travel

4   restrictions and various other conditions, including

5   screening, mandated employment and education.

6           What the Court should gather from the family support

7   he has is that he also has substantial ties to this community,

8   having spent most of his childhood years here, graduated from

9   high school here and has worked at various types of employment

10  over the years, both here and elsewhere, but the majority of

11  family is here in Rochester and they're very supportive of

12  him.  As the government alluded to, his very young son also

13  lives here, in addition to multiple generations of his family.

14          Regarding criminal history, the two convictions that

15  the government spent much time speaking of, in terms of the

16  robbery and the shotgun matter from Virginia, those were

17  convictions from 31 and 37 years ago.  The pretrial report

18  notes that he successfully completed supervision in connection

19  with both of these offenses.

20          And as to the Virginia probation term, although he

21  did move away from Virginia during the term of supervision, as

22  the government candidly acknowledged, he did appear

23  voluntarily and was permitted to continue on probation.

24          The Court should consider releasing Mr. Wilbern in

25  light of the substantial bail package that we've presented, in

1   light of his substantial ties to the community and his

2   family's substantial ties to the community and because, as it

3   now seems to be confirmed, the government's case is based

4   largely on DNA evidence that is highly unreliable.

5          We have an informant who, more than ten years after

6   the fact, is described as saying that the person depicted in

7   the video is likely Mr. Wilbern.  We have, from the limited

8   discovery we've received, photographs of this umbrella on a

9   table that's not protected by any sort of sterile lab paper

10  that I can tell.  We know that the -- from what Mr. Gregory

11  indicates, the umbrella was put on a desk.  We're dealing with

12  such tiny quantities of DNA here that one cell can skew the

13  results.

14         There's testimony in the *Morgan* case from an LCN

15  technologist at OCME who was testing LCN on a lighter and he

16  became the major contributor in a mixed sample on the lighter,

17  because one of his cells, despite all of their precautions,

18  made it into the sample.  So, we have a high-risk of cross-

19  contamination.  We have, as I indicated, photograph of the

20  umbrella sitting on the table that had no protection

21  whatsoever.  We have a procedure that is highly unreliable.

22         If the Court looks at the President's Counsel of

23  Advisors on Science and Technology, sort of a blue ribbon

24  panel commissioned to investigate forensic science in the

25  courts, they produced a report last year.  And one of the

 1   conclusions was that the subjective analysis of complex DNA

 2   mixtures has not been established to be foundationally valid

 3   and is not a reliable methodology.  One of these samples --

 4   one of these tiny samples is a mixture of at least two

 5   contributors and this is the type of evidence that the

 6   President's Counsel has found to be unreliable.

 7          In addition, there's another technology that OCME

 8   uses, it's a forensic statistical tool used by it to determine

 9   mixtures.  That is another factor that may have come into play

10   in this case.  And again, we don't have what we need in terms

11   of the lab reports, the electropherogram, the actual data that

12   was that was created here, but to the extent that OCME, in

13   addition, used this forensic statistical tool that has no

14   reliability, this may have also contributed to unreliable

15   conclusions with respect to the mixed sample.

16          We don't know if the dismissed scientist from OCME,

17   people who were dismissed for misconduct and falsifying

18   results, we don't know if any of those personnel were involved

19   in producing this original sample back in 2011.

20          What I can tell you, Judge, is that the government

21   continues to use OCME and that's of some concern to us.  We're

22   dealing with tiny samples.  It seems to me there's probably

23   the risk that the government is going to be consuming the

24   samples entirely, using a process that the Department of

25   Justice, in another case, found to be unreliable.  I think

 1  that will probably be the subject of some relief I ask for in

 2  the future, but I think it's of a concern that the Department

 3  of Justice has, in one occasion, said this is a reliable

 4  process and in other said it's very unreliable.

 5          THE COURT:  Does the fact that this allegedly

 6  unreliable process -- when taking into account some problems

 7  that you've identified -- was used to test DNA and the DNA

 8  came back identifying of all the people in the world,

 9  Mr. Wilbern, given his connections to Xerox, his connections

10  to the credit union, his connections to people that may have

11  identified him as being in the bank surveillance photographs

12  and the wig and the FBI jacket, how do you respond to the

13  argument of the government that that corroborates the

14  reliability and the accuracy of the DNA evidence?

15          MS. BURGER:  And my response to that will be to have

16  Dr. Skuse testify to explain to the Court the studies that

17  I've cited and admittedly, they're very complicated.  And in a

18  shorthand, if you're analyzing two --

19          THE COURT:  Assuming everything you're saying is

20  true, your argument is that it's an incredible coincidence

21  that of all the people in the world whose DNA matched, it's

22  Mr. Wilbern's that it matched to?  That's just an unbelievable

23  coincidence.

24          MS. BURGER:  Well, I guess I will -- I will wait to

25  see what was done by the lab, not only back in 2011, but also

 1   with Mr. Wilbern's sample.  One thing that we've learned from

 2   reviewing old court records is that, contrary to what the

 3   government has indicated, Mr. Wilbern was ordered to submit a

 4   DNA sample in conjunction with the Virginia conviction.  I

 5   know the government's taken the position that he's never had

 6   to give a sample and therefore, you know, we couldn't run it

 7   against the NDIS or CODIS.

 8          Well, we know that the FBI does not permit this type

 9   of DNA analysis to be uploaded to the national NDIS database,

10   but it -- it can be uploaded to various state databases.  And

11   so, what's troubling to me, at this moment, is, why did the

12   government not realize that a sample was previously ordered to

13   be produced in conjunction with the Virginia matter?

14          And do we have a problem with the analysis of the

15   swab -- not the swab, the surreptitious gathering of DNA that

16   was relied on in the lab to make the comparison with

17   Mr. Wilbern.  I mean, I have concerns because of that.

18          So, I guess my -- my first question is, what did the

19   sample actually look like that the lab received that was

20   associated with Mr. Wilbern and how did that compare to the

21   pristine sample that he was ordered to submit to in

22   conjunction with the Virginia conviction and do we have some

23   contamination in that supposedly controlled sample?

24          And I think that would -- having that information,

25   which I don't have now, Judge, would allow me to answer that

```
 1   question, because I don't think it's a safe assumption that

 2   the lab's analysis of DNA from the envelope was at all

 3   reliable, particularly in light of what I just indicated.  I

 4   think that we would have gotten a hit based on -- based on

 5   reviewing court records, indicating that Mr. Wilbern was

 6   required to submit to a DNA sampling in conjunction with the

 7   Virginia case.

 8          And at this point, I'd like to call Dr. Gary Skuse as

 9   the concluding portion of my proffer.  I know the Court has

10   already received his CV.  And the purpose of my calling him

11   is limited to discussing and explaining some of the

12   complicated terms in the studies that I attached to my initial

13   filing, which is document 17.

14          THE COURT:  How long do you expect his direct

15   testimony to be?

16          MS. BURGER:  My direct, probably 15 minutes.

17          THE COURT:  Okay.  Go ahead.

18          MS. BURGER:  Thank you.  Defense calls Dr. Gary

19   Skuse.

20   (The witness was sworn at 4:03 p.m.)

21   (An off-the-record discussion was held.)

22          THE COURT:  Good afternoon.

23          THE WITNESS:  Good afternoon.

24

25
```

```
 1                          DIRECT EXAMINATION

 2

 3    BY MS. BURGER:

 4    Q.  Good afternoon, Dr. Skuse.

 5    A.  Good afternoon.

 6    Q.  Where do you work?

 7    A.  I am -- currently work at the Rochester Institute of

 8    Technology.

 9              THE COURT:  Ms. Burger, I have no objection if you

10    want to use that podium.

11              MS. BURGER:  Actually --

12              THE COURT:  Okay.

13              MS. BURGER:  I kind of --

14              THE COURT:  Okay.  I just wanted you to know.

15              MS. BURGER:  Thanks, Judge.

16    BY MS. BURGER:

17    Q.  What do you do there?

18    A.  I'm a Professor of Biological Sciences.

19    Q.  In the Bioinformatics Program?

20    A.  It's the School of Life Sciences and I was associated

21    with the Bioinformatics Program within that school for a

22    number of years.

23    Q.  Are you here today as an employee of RIT, as a professor?

24    A.  No, I'm -- I am not.

25    Q.  You're here because my office is paying you to testify?
```

1   A.   That is correct.

2   Q.   What's your education relating to your work at RIT?

3   A.   Pretty much all of it.  I earned a Bachelor's Degree in

4   Biology from the University of Rochester and I followed that

5   with a Ph. D. in Developmental Genetics, which is the study

6   of the way genes are turned off and on during embryological

7   development.  I earned that at Syracuse University.

8         I followed that with post-doctoral training at

9   Harvard Medical School in viral genetics, studying the way

10  genes are turned off and on during viral infections.  I

11  followed that with some additional training at the University

12  of Rochester Medical Center in human genetics and then, I

13  joined the faculty there.  Along the way, I studied ethics at

14  Dartmouth College and embryology at the Woods Hole Marine

15  Biological Laboratory.

16  Q.   And do you receive federal grants to conduct research in

17  the area of genetics?

18  A.   Yes.  I have in the past, yes.

19  Q.   From what entities?

20  A.   I received grants from the National Institute of Health

21  and from the National Science Foundation.

22  Q.   Are you a full professor at RIT?

23  A.   I am, yes.

24  Q.   Would it be accurate to say that you train students to

25  become biomedical researchers and technologists?

1   A.   That's absolutely correct.

2   Q.   And also to perform comparative genomics?

3   A.   Yes.

4   Q.   Molecular imaging?

5   A.   Yes.

6   Q.   And to be geneticists themselves?

7   A.   I hope that they will be, yes.  I do train them for that.

8   Q.   Do you teach undergraduate, graduate or both?

9   A.   I teach both.  Currently at RIT, I teach undergraduate

10  courses and I mentor Master's level students in their thesis

11  work in their research.

12  Q.   I'm going to show you Defendant's A being marked for

13  identification.  Do you recognize that?

14  A.   Yes, I do.

15  Q.   What is it?

16  A.   It's my curriculum vitae.

17  Q.   Okay.  Is that accurate and up-to-date as of today?

18  A.   Yes.

19  Q.   And it describes your education, your training, studies,

20  research articles, things like that?

21  A.   Yes, it does.

22       MS. BURGER:  I would offer it as an aid to the

23  hearing today.

24       THE COURT:  Any objection?

25       MR. GREGORY:  No.

1        THE COURT:  Without objection, received.

2   (Defendant's Exhibit A was received in evidence.)

3

4   BY MS. BURGER:

5   Q.   Now, in conjunction with coming here today, you and I

6   have spoken before, correct?

7   A.   Yes.

8   Q.   And with respect to certain articles, I'm going to show

9   you Defendant's B, C and D, premarked.  Are you familiar with

10  those articles?

11  A.   I am.

12  Q.   Have you read them?

13  A.   Yes, I have.

14  Q.   And you're familiar with them because I provided them to

15  you?

16  A.   That's correct.

17  Q.   Did you read through the scientific article by Bruce

18  Budowle titled, "Low Copy Number Typing Still Lacks

19  Robustness and Reliability"?  It's got the --

20  A.   Yes.

21  Q.   -- Exhibit C sticker?

22  A.   Yes, I did.

23  Q.   In that article, what did the author explain that he

24  meant by the LCN typing lacking "robustness"?

25  A.   So, he used the word robustness to describe the lack of

SKUSE - DIRECT - BURGER

1   reproducibility.

2   Q.   What does that mean?

3   A.   It means when low copy number testing is done more than

4   once on the same sample, the results can differ.

5   Q.   So, what you mean, with your last answer, was that having

6   the same data, looking at it multiple times, you don't see

7   the same results?

8   A.   Yes.  Having the same DNA and testing it multiple times,

9   you can get different results.

10  Q.   Did the article -- and again, we're talking about

11  Exhibit C, did the article mention peak height imbalance?

12  A.   Yes.  He referred to allelic imbalance in peaks that

13  should have been derived from the same individual and he

14  talked about how peak height imbalance typically happens, but

15  the problem is exacerbated in low copy number analyses.

16  Q.   You mentioned allele.  What's an allele?

17  A.   An allele is a sequence of DNA that can be different in

18  different individuals.  So, I refer to it as a version of

19  that sequence of DNA.  And it --  and it allows us to

20  distinguish among individuals, if we actually look at them in

21  a laboratory.

22  Q.   And is the allele simply genetic material that we get

23  from our parents?

24  A.   That's all it is, yes.

25  Q.   And at any specific position on a chromosome, in a single

1  human being's DNA, we could have information there, genetic

2  information?

3  A.   Yes.

4  Q.   And how many versions of genetic information in a single

5  human being's chromosome in that one location?

6  A.   Right.  Since we have pairs of chromosomes and we

7  inherited each member of the pair from our parents, we can

8  have at most two; one from our mother and one from our

9  father.

10 Q.   So, now that we've talked a little bit about alleles,

11 could you explain again peak height imbalance --

12 A.   Yes.

13 Q.   -- in that context?

14 A.   So, since we receive the same amount of DNA from each

15 parent, we -- we do have the same amount of DNA from each

16 parent in all of the cells of our body.  In the laboratory,

17 when we analyze those alleles, when we look at them, we would

18 expect to see the same -- let me step back just a moment.

19        The way we look at them in the laboratory is, we use

20 a process called a polymerase chain reaction which recognizes

21 the DNA that's in those alleles and amplifies it so that

22 there's enough to analyze.

23 Q.   And when you're reading -- talking about Exhibit C, Bruce

24 Budowle's article, is he talking about peak height imbalance

25 in the context of polymerase chain reaction?

SKUSE - DIRECT - BURGER

1   A.   Yes, he is, yes.

2   Q.   And by the way, these articles that are in front of you,

3   Exhibits B, C and D --

4   A.   Yes.

5   Q.   -- are these articles that you rely on in your

6   professional work as a professor in the Bioinformatics

7   Program at RIT?

8   A.   All the time.  That's what we do.

9   Q.   And based on your training and education, were you

10  familiar with the terms and concepts discussed in these

11  articles?

12  A.   Yes.

13  Q.   Now, the article that we're talking about, did it also

14  mention -- and it's Exhibit C, did the article mention allele

15  drop-out?

16  A.   Yes.

17  Q.   What did the article say about that?

18  A.   Well, so, allele drop-out is a phenomenon where there may

19  be an allele present, but it's not detected by the polymerase

20  chain reaction.  And the author said, that while that does

21  occur, it occurs more frequently with small amounts of DNA,

22  such as those that are analyzed with low copy number testing.

23  Q.   So, one of the complaints of the author was that with low

24  copy number or LCN DNA testing, you could have the absence of

25  an indicator of genetic material, even though there's

1  actually genetic material present?

2  A.  That's correct.  He described it as the failure to detect

3  an allele that's really there.

4  Q.  And the other end of the spectrum, did the author mention

5  drop-in -- allele drop-in?

6  A.  Yes, he does.

7  Q.  And what did he explain about that?

8  A.  Allele drop-in occurs when extraneous DNA -- and what I

9  mean by that is DNA that didn't come from the individual

10  who's the contributor of the DNA that's being analyzed.  When

11  extraneous DNA gets into the system -- and it can come from

12  any number of sources including contamination of the reagents

13  that are used in the laboratory, could be from an article of

14  evidence that had someone else's DNA mixed with the first,

15  could come from a number of places.

16  Q.  So, what you're saying is that the author, in his

17  description of allele drop-in, described that you could have

18  essentially a false positive where there is no DNA

19  attributable to the sample being analyzed?

20  A.  That's an accurate way of describing it, yes.

21  Q.  So, with low copy number DNA testing, the author

22  complains about there being peaks where there shouldn't be

23  peaks and no peaks where there should be peaks?

24  A.  That's correct.

25  Q.  And a peak being a representation of genetic material at

1  a particular location?

2  A.   Yes.   The peak is a representation of the products of the

3  polymerase chain reaction.

4  Q.   Did the article mention stutter peaks?

5  A.   The article did.

6  Q.   What did the author explain about stutter peaks?

7  A.   So, stutter peaks occur infrequently, but they do occur

8  in PCR when you get a misalignment of the DNA that's being

9  amplified.   And you essentially get a peak that's one copy --

10  not sure if I need to explain that -- but one -- one peak

11  less than the peak should be.   And he said that that problem

12  is exacerbated in low copy number analyses.

13  Q.   Does that affect the accuracy of the final determination,

14  according to the author?

15  A.   Yes.

16  Q.   Did the author mention stochastic effect?

17  A.   Yes, he did.

18  Q.   What did the author explain about what that meant?

19  A.   Well, stochastic effects, generally speaking, are random

20  effects.   And he emphasized that random effects are, again,

21  exacerbated in low copy number analyses.   And basically,

22  that's an effect that has to do with the fact that you're

23  analyzing such a small amount, the signals that you get are

24  relatively small and therefore, random events are more

25  visible.

SKUSE - DIRECT - BURGER

1  Q.  By a random event, that would be a report of information

2  where there is no genetic material relating to the sample

3  being analyzed?

4  A.  It would be the equivalent of a drop-out that you

5  referred to earlier.

6  Q.  Okay.  And did the author mention stochastic threshold?

7  A.  Yes.

8  Q.  What did he explain about stochastic threshold?

9  A.  Well, he explained very well, in my opinion, that

10 stochastic thresholds exist in DNA typing to -- they're

11 essentially an indication of how confident the laboratory is

12 in what they're looking at.  And stochastic thresholds need

13 to be established in laboratories, in each individual

14 laboratory, so each individual laboratory can have confidence

15 in what they're seeing.  And he said those are difficult --

16 he may have said impossible -- but I'll say difficult to

17 establish with low copy number because they are no good

18 controls for validating the technique.

19 Q.  Now, with respect to Exhibit B, an article by Angela van

20 Daal titled, "LCN DNA Analysis:  Limitations Prevent "General

21 Acceptance" ".  Did you read that article?

22 A.  Yes, I did.

23 Q.  Okay.  And in that article, the author contrasted the

24 reliability of traditional DNA analysis with LTN -- LCN

25 analysis, correct?

1   A.   Yes, she did.

2   Q.   And did the author report that LCN was as reliable as

3   traditional DNA analysis?

4   A.   No.   In fact, the author said they were not.

5   Q.   Could you tell us what were the failures or weaknesses of

6   LCN analysis identified by the author in that article?

7   A.   Well, the other number of points, one of those points was

8   that good validation studies are difficult, if not

9   impossible, to do with low copy number.   So, simply saying

10  that we validated the less sensitive, more common technique,

11  doesn't mean that the same validation applies to the low copy

12  number technique.

13        She also commented about -- she has a very

14  informative table -- about how many cells worth of DNA there

15  are in the samples and it's -- it's striking how few cells

16  there are and in that light, how important contamination

17  could be.   When you've only got three cells of evidence, one

18  cell coming from someone else could really mislead the

19  interpreter.

20  Q.   And did Ms. van Daal mention a problem with LCN analysis

21  not being reproducible?

22  A.   Yes, quite a bit actually, yes.

23  Q.   What did she say about that?

24  A.   Well, she said it's -- it's not reproducible and it's --

25  it's generally accepted in the field that it's not

1  reproducible.

2  Q.  By the way, what do you mean by -- what does she mean by

3  reproducible?

4       MR. GREGORY:  Judge, I'm going to object.  How can he

5  interpret what --

6       THE COURT:  Sustained.

7  BY MS. BURGER:

8  Q.  What did Ms. van Daal say?

9       MR. GREGORY:  And also, don't these documents just

10  speak for themselves?

11      THE COURT:  I'm going allow a little bit more.  We're

12  coming up on the 15 minutes, but go ahead.

13  BY MS. BURGER:

14  Q.  What did Ms. van Daal say about LCN analysis not being

15  reproducible?

16  A.  Well, she says that when you analyze the same sample more

17  than once, you get different results, which is the definition

18  of irreproducibility.

19  Q.  And with respect to the final article by Bruce Budowle

20  titled, "Validity of Low Copy Number Typing and Applications

21  to Forensic Science" --

22  A.  Yes.

23  Q.  -- this article was another one you read, correct?

24  A.  I'm sorry.  What was your question?

25  Q.  This was another of the articles that you read?

1   A.  Yes, it is.

2   Q.  Okay.  It mentioned many of the same concepts that we've

3   been discussing?

4   A.  Yes.

5   Q.  And would it be accurate to say that, in that article,

6   the author raised a concern that there was a greater

7   potential for error, compared to conventional STR typing with

8   LCN?

9   A.  Yes, he did.

10  Q.  And that author also mentioned in his article that LCN

11  profiles are not generally reproducible?

12  A.  Yes, he did.

13  Q.  Which, in that article, discussed having different

14  results every time you run the same sample?

15  A.  And -- and having a challenge to determine which of those

16  is correct and which of them is not.

17          MS. BURGER:  Thank you, Judge.  I think that the

18  exhibits are already before the Court, but for purposes of the

19  hearing I would offer them as aids to the Court.

20          THE COURT:  All right.  I think they're part of the

21  record, but any objections?

22          MR. GREGORY:  No, Your Honor.

23          THE COURT:  All right.  Okay.

24  (Defendant's Exhibits B, C and D were received in evidence.)

25

1          THE COURT:  Before you do cross, I just have one

2     question on one of these articles.  I wasn't sure whether you

3     were going to cross on them or not.  I think the second

4     article, which is the longest article, which is "Validity of

5     Low Copy Number Typing and Applications in Forensic Science"

6     by Bruce Budowle.

7          THE WITNESS:  Yes.

8          THE COURT:  Can you take a look at the conclusion?

9          THE WITNESS:  Yes.

10         THE COURT:  It discussed the findings, but I just

11    want to find out what your view is on the conclusion.

12         THE WITNESS:  Yes.

13         THE COURT:  It says, LCN typing, by its nature,

14    cannot be considered robust.  However, currently, it does have

15    a place in the forensic science toolbox, primarily for

16    developing investigative leads.  What does that mean to you?

17         THE WITNESS:  That means, to me, that it's good for

18    identifying suspects, but not good for convicting people.

19         THE COURT:  Okay.  So, what it means to you is that

20    if this particular test was used, the LCN test was used to

21    identify a suspect and then further investigation provided

22    corroborative evidence, that the LCN would be useful in, at

23    least, identifying someone to investigate further?

24         THE WITNESS:  That's what -- that's how I interpret

25    that.

1          THE COURT:  Okay.  Any cross-examination?

2          MR. GREGORY:  Just a few questions.

3

4                        CROSS EXAMINATION

5

6   BY MR. GREGORY:

7   Q.  The articles that you were supplied with, prior to

8   Ms. Burger giving them to you, had you ever seen them before?

9   A.  To be -- I can't answer that.  I'm not sure if I have or

10  not.  I have a large collection of articles.  I'm not really

11  sure.

12  Q.  Off the top of your head, before she gave it to you, do

13  you recall reading those articles ever before?

14  A.  No, I do not.

15  Q.  The --

16  (An off-the-record discussion was held.)

17  BY MR. GREGORY:

18  Q.  You would agree that if a DNA analysis on a piece of

19  evidence that was able to develop a profile at all 15 loci,

20  that would be considered a full profile?

21          MS. BURGER:  Judge, this is way beyond the scope of

22  the proffer of the witness.  I did not offer him as an expert

23  offering an opinion about the reliability of the process or

24  anything beyond explaining the words that were in the

25  articles.  I would object.

1          THE COURT:  Overruled.

2          THE WITNESS:  Depends what kit was used to generate

3   them.  There are PowerPlex kits that start at 16 going to, I

4   think, 23.  So --

5   BY MR. GREGORY:

6   Q.  Let me just stop you there.

7   A.  Okay.

8   Q.  If you're -- if you have a kit, any kit that is

9   reputable, accredited, that you are familiar with and it

10  had a match at 15 loci, plus the 16th being the sex, you

11  would consider that to be a full profile, correct?

12  A.  Only if the kit was designed to do 15 plus 1.

13  Q.  Okay.  If the kit was designed --

14  A.  To do 15 plus 1, I would call that a full profile.

15  Q.  And you know that the FBI, in the past, in order to

16  upload information into CODIS, would require a hit at 13

17  loci?

18  A.  When the kits were only able to do 13; that is correct.

19  Q.  All right.

20  A.  So-called CODIS Core Loci.

21  Q.  Okay.  You've previously testified that if a person using

22  a kit that was designed to match at all 15 loci, I think you

23  testified in another case, that the probability of it being

24  someone other than a suspect is one in 6 quintillion; isn't

25  that fair?

1   A.   Those are the sorts of numbers that were used, yes.

2   Q.   No, no.  Did you say that?

3   A.   If you can point to a specific case; I've done a number.

4   Q.   Let me ask you this.  Do you recall testifying in the

5   case of Philip Ruiz, in federal court, when you were asked

6   certain questions from a John Humann from the Federal

7   Defender's Office?

8   A.   Oh, yes, I do.

9   Q.   And you recall, in that case, that the technology is very

10  different in the 2000's than it was in the 80's and the 90's?

11  A.   Oh, very much different, yes.

12  Q.   Because the testing kits that are out there are so much

13  more sensitive, they're able to detect DNA at much lower

14  levels, correct?

15  A.   That is correct, yes.

16  Q.   And I think, in response to a question posed by

17  Mr. Humann, you answered -- and you answered into whether or

18  not a single cell could be tested, you specified, the thing

19  that has made us better primarily are detection techniques.

20  So, back then, we used to need enough DNA so that when we

21  made a million copies of it, there was enough to begin with

22  so that we can detect it and we've now gotten to the point

23  where we can analyze DNA from a single cell.

24  A.   I've been told that can be done in a laboratory, yes.

25  Q.   Okay.  Did you testify to that under oath in a federal

 1  court?

 2  A.  Apparently, I did.

 3  Q.  And you testified to that because it's true, right?

 4  A.  In a research laboratory, it's absolutely true.

 5  Q.  And it's true because the scientific methods that are

 6  used to test DNA are so much better now than they were in the

 7  past, correct?

 8  A.  Yes.

 9  Q.  A single cell contains about six picograms of human DNA,

10  correct?

11  A.  That's what I'm told, yes.

12  Q.  And that would be considered a low copy number, correct?

13  A.  One cell?  It's as low as it gets, yes.

14  Q.  But you have also testified that you can test down to six

15  picograms, if we follow your logic?

16  A.  In a research laboratory, yes.

17  Q.  And I think you testified today that when you used low

18  copy analysis, certain stochastic events occur, like allele

19  drop-in, allele drop-out, stutter and the like?

20  A.  I testified that that's what these authors said, yes.

21  Q.  Well, is that your understanding that that can happen?

22  A.  It is my understanding.

23  Q.  Isn't it also true that that can happen if you're testing

24  high copy numbers?

25  A.  That's true.

1  Q.  And given the fact that it can happen in both high copy

2  number situations and low copy number situations, the

3  particular lab that is testing it has got to come up with

4  procedures or protocols that will assist them in interpreting

5  when those stochastic events occur, correct?

6  A.  Yes.

7  Q.  So, if I'm an analyst and I've done hundreds of low copy

8  number testing, you would agree with me that I would -- as

9  long as I'm following the protocols of my lab, you would

10  agree with me that I'd have a pretty good idea of when those

11  stochastic events are occurring, correct?

12  A.  When -- if you could clarify?  When you say a feeling, do

13  you meant a gut feeling about whether you're --

14  Q.  When you see it after you take the electropherogram and

15  you have it on the screen, if you've analyzed hundreds of

16  these things, is it fair to say that a more experienced

17  person -- analyst is looking at that, is going to be able to

18  recognize when those stochastic events occur and adjust their

19  interpretation?  Is that fair to say?

20  A.  I'm not sure that that's fair, because you rejected my

21  contention that you're asking for a gut feeling.  So, I have

22  a lot of experience and I know when things are feeling right

23  or they don't feel right.

24  Q.  I'm not asking about a gut feeling.

25  A.  I know.  That's --

1   Q.   Right.  As long as it looks clear.

2   A.   Okay.

3   Q.   If they follow the accredited and approved procedures and

4   protocols for evaluating DNA when stochastic events occur --

5   so, it's not a gut feeling, they're following the

6   protocols -- you would agree with me that a very experienced

7   analyst would be able to determine when those events

8   occurred, correct?

9   A.   They would suspect that they occur, yes.  They wouldn't

10  know for certain.

11  Q.   Well, as opposed to a less-experienced analyst?

12  A.   So, the reason protocols exist is so that someone, on

13  their first day in the laboratory, should be able to generate

14  reliable results.  That's why standard operating procedures

15  exist.

16  Q.   If I drive down the road and there's a number of

17  obstructions in front of me, the first time I drive down that

18  road, I might hit one of those obstructions, correct?

19  A.   Hope not, yes.

20  Q.   But if I drive down that road 400 times, I'm going to

21  recognize where those particular obstructions are and account

22  for that, correct?

23  A.   It's likely.

24  Q.   As we sit here today, do you have any information

25  whatsoever that allele drop-in or drop-out or stutter

1   occurred in this case?

2   A.  Not as we sit here today.

3   Q.  And I know you're just interpreting the paperwork that

4   you have before you, but you're not testifying here today

5   that LCN testing is categorically 100 percent unreliable,

6   correct?

7   A.  I am not saying that, no.

8        THE COURT:  What you are saying is, in your opinion,

9   it's less reliable than traditional DNA testing?

10       THE WITNESS:  Yes.  Very accurately what I'm saying

11   is these authors say that it's less reliable than the more

12   typical high copy number testing.

13   BY MR. GREGORY:

14   Q.  Right.  And you know, because you do an awful lot of

15   reading on these things, that there's just as many articles

16   on the other side of this argument than there are in front of

17   you?

18   A.  Well --

19   Q.  Is that fair to say?

20   A.  I'm not -- I can't quantify how many there are articles

21   on the other side, of course.

22   Q.  Of course.  Because scientists disagree?

23   A.  That's how science works.

24   Q.  That's how science --

25   A.  Kind of like a courtroom.  We challenge each other, we

1  further our investigations and we determine who has a better

2  picture of the way nature really is.

3  Q.  And then, the jury decides who's right, right?

4  A.  Well, not in my world, but in your world, yes.

5          MR. GREGORY:  Okay.  Thank you.

6          THE COURT:  Anything else?

7          MS. BURGER:  Yes.

8

9                  REDIRECT EXAMINATION

10

11  BY MS. BURGER:

12  Q.  Mr. Gregory asked you a couple questions about these new

13  kits and how reliable they are.  So, I have one or two

14  questions about that to begin with.  With respect to these

15  kits and their reliability, the kits come with instructions

16  from the manufacturer about their proper usage, correct?

17  A.  Yes.

18  Q.  And the instructions from the manufacturer are the way to

19  achieve the highest degree of reliability by using the

20  kits --

21  A.  Yes.

22  Q.  -- correct?

23  A.  Yes.

24  Q.  So, with respect to the kits that are described and the

25  testing was described in the articles you read, were these

1    kits being used to create 28 replications of the DNA, or were

2    they being used above and beyond what the manufacturer called

3    for?

4    A.   They were being used above and beyond what the

5    manufacturer called for.

6    Q.   So, the OCME, according to these studies, OCME or other

7    labs doing LCN, they don't follow the manufacturer's

8    instructions for the kit?

9    A.   That is true.

10   Q.   And since Mr. Gregory asked you your opinion about some

11   of these things, in your opinion, would that affect the

12   reliability of the very reliable kit if you don't use it

13   according to the manufacturer's instructions?

14   A.   The reason we -- in my laboratory, the reason we purchase

15   kits is because we essentially offload the development, the

16   validation and the quality assurance to the manufacturer of

17   the kit.  We buy it with the confidence that if we follow the

18   instructions, it's going to work the way they told us it

19   would.

20   Q.   Now, with respect to the Ruiz case that Mr. Gregory asked

21   you about --

22   A.   Yes.

23   Q.   -- did that case involve a lab doing LCN DNA testing?

24   A.   No, it did not.

25   Q.   Okay.  Do you recall that that lab failed to follow the

1  manufacturer's recommendations in using the kits?

2  A.  There was no mention of it.

3  Q.  Okay.  You mentioned a couple times, not in a research

4  lab?

5  A.  Okay.

6  Q.  Could you explain what you meant in terms of how doing

7  your work in a research lab is different, if at all?

8  A.  Yes.  It's actually related to the comments at the end

9  when we talked about a jury.  In a research laboratory, our

10  goal is to learn things we didn't know before.  We need to

11  learn more about nature.  I'm called a natural scientist

12  because I try to understand nature.

13      And the way it works in a research laboratory is we

14  do experiments, we interpret them, we publish them in peer

15  review journals.  And if another laboratory wants to

16  reproduce my results, they will.  And if they disagree with

17  them, that's how science progresses, because we'll learn a

18  little bit more if they disagree, because then my laboratory

19  apparently will look more closely at it and say, okay, why

20  did we disagree?  Is it a difference in the procedure we used

21  or is there really something going on that my laboratory

22  didn't detect?

23      So, research laboratories, our goal is to push the

24  frontiers of doing things people didn't do before.  And if we

25  make mistakes, someone else finds it.  That's part of the

1    system and we progress our understanding of science.

2    Q.   And in your instance, if somebody makes a mistake,

3    nobody's going to prison?

4    A.   That's an enormous difference, yes.

5    Q.   And one final area that Mr. Gregory talked to you about,

6    he talked about approved procedures and sort of essentially

7    validations of the procedures and I think you were saying on

8    day one, the new scientist should be able to get the same

9    results following these procedures.  So, questions related to

10   that.

11        With respect to these sort of validation studies

12   that produce lab protocols, is there any correlation between

13   the test samples used in the validation study being

14   reflective of the casework that'll be done in the lab?

15   A.   No.  Actually --

16   Q.   Is there a serious problem?

17   A.   -- that's a serious flaw in the validation process.

18   Laboratory samples are clean.  They're pure.  We know what

19   they are when we add them to the system.  Pristine is a word

20   that people often use.  Whereas, at a crime scene, you don't

21   know what you got.  I mean, it could be contaminated, it

22   could come from multiple sources, it could be degraded.  Even

23   our quantification of how much is there is not as accurate as

24   it could be.  So, in a laboratory, under controlled

25   conditions, it's as good as it gets.  It's the best we could

possibly do.
Q. And then, one of the complaints in these studies, with respect to the so-called validation being done with LCN, is the validation's being done using pristine samples that aren't anything at all like the casework that's actually ultimately going to be done?
A. That's what the author's saying and goes further to say that there is no good control. You can't actually reproduce the DNA you get from a crime scene because you don't know -- you don't understand it.
Q. So, in this context, and the context of Mr. Gregory's questions, these so-called validation protocols really don't provide any sort of safety net in the context of LCN testing based on the articles you read?
A. Right. They're rough guidelines, but they're not very accurate.
MS. BURGER: Thank you, Judge.
THE COURT: Anything else?
MR. GREGORY: No, Judge.
THE COURT: All right. Does that conclude the defense proffer?
MS. BURGER: Just one second, Judge. Thank you, Judge, I think we're finished.
THE COURT: Anything else from the government?
MR. GREGORY: No, Judge.

1           THE COURT:  All right.  I'm going to take a 15-minute

2    recess.  I appreciate the proffers, they were very helpful and

3    I'll give you my decision when we reconvene.  Jennifer, 15

4    minutes.  Thank you, sir.

5           THE WITNESS:  Thank you.

6    (The witness was excused.)

7           THE CLERK:  All rise.

8    (Brief recess)

9           THE COURT:  All right.  I have heard the proffers and

10   the testimony that's been presented by both defense and the

11   government and I am ready to rule.

12          Mr. Wilbern, I'm going to direct my remarks to you,

13   since it's your liberty that's at stake here.  The government

14   has moved for detention.  The law allows them to move to

15   detain you without bail.  They can move on one or two grounds.

16   Here, they've moved on two grounds.  The two grounds are that

17   you present a risk of flight and the second ground is that you

18   present a danger to the community.

19          With respect to the ground on risk of flight, the

20   government's burden is to prove that you present a risk of

21   flight by a preponderance of the evidence.  With respect to

22   danger to the community, the government's burden is higher.

23   They must prove that by clear and convincing evidence.

24          Where a defendant in federal court is charged with

25   certain crimes, the government's burden to meet one or both of

1   these standards is aided by what the lawyers call a

2   presumption.  And essentially, Congress has passed a law which

3   says that if a defendant is charged with a certain type of

4   crime, that the Court has to presume that the person is

5   dangerous and the Court has to presume that the person

6   presents a risk of flight.

7           Now, that presumption can be rebutted, but it is a

8   presumption that I believe applies in this case to both the

9   charges that you currently face.

10          In other words, you have two charges; one is having

11  been previously convicted of a felony, you possessed a firearm

12  and ammunition and the second is that in the course of a bank

13  robbery, you caused the death of another person by discharging

14  a firearm.  Both those crimes, in my view, qualify as crimes

15  in which this presumption would apply.

16          And therefore, because the Grand Jury has returned an

17  indictment charging you with these two charges, I am applying

18  the presumption that I must, that I'm required to apply,

19  presuming that, as we start the hearing, that you present a

20  risk of flight and that you present a danger to the community.

21          Now, as I indicated to you, that presumption is

22  rebuttable and I've listened carefully to the proof that the

23  government's presented and the proof that Ms. Burger has

24  presented on your behalf, including the testimony of the

25  professor.

1          As you can tell, this is not a trial.  We don't have

2     formal rules of evidence in bail hearings.  The trial would

3     come later and all the protections that normally inure to

4     trials, such as hearsay rules, rules of evidence, rules of

5     confrontation would apply, but they don't apply in a hearing

6     like this.

7          So, the reason I tell you that is because you are

8     presumed innocent and that presumptions stays with you

9     throughout these proceedings.  And although I have to make

10    certain findings here that I'm required to make, as part of

11    the bail process, I want you to know that none of the findings

12    I make here will affect or denigrate the presumption of

13    innocence which you're cloaked with and you will continue to

14    be cloaked with throughout these proceedings until either a

15    finding of guilt has been made or a conviction has been

16    entered by way of a plea of guilty.  So, that presumption

17    stays with you throughout the proceedings.

18         There's no litmus test for me to determine whether

19    somebody's either going to come back to court or flee or be a

20    danger to the community.  If there was, we'd run the

21    information through a computer and find out what it is and

22    judges would have a lot easier time in making decisions on

23    bail.  They are difficult decisions.

24         But the law provides a number of factors that I have

25    to consider.  One of the factors is the strength of the

1  government's case and we've spent a lot of time on that factor

2  today.  But I want to tell you, as often the defense reminds

3  me, even though the defense really brought up this issue, this

4  is the least important factor.  Of all the factors, the

5  strength of the government's case is the least important.

6       But because we spent a lot of time on it,

7  particularly discussing the DNA, I feel compelled to spend

8  some time discussing it.  And after listening to the evidence

9  and considering the arguments, including the testimony of the

10  professor, I conclude that even if I was to assume, for the

11  sake of argument, that low copy number or LCN DNA testing is

12  less reliable than traditional DNA testing, I don't believe

13  those test results in this case could be used or viewed in a

14  vacuum.

15       Even if that form of testing is less reliable, the

16  evidence presented to me indicated that it matched your DNA.

17  Now, whether that match was conclusive evidence that might be

18  attributed to traditional DNA testing, or simply an

19  investigative lead, as one of the articles suggested it would

20  be, I have to look at the other facts presented here and the

21  other facts is that that so-called less reliable evidence

22  identified you and there are other facts which have been

23  presented to me which connect you to the crimes you are

24  charged with.

25       The DNA identified someone who worked at Xerox at or

1    about the time that the crimes occurred.  It identified

2    someone who was familiar with the location of the crime, who

3    banked at the credit union before the robbery.  It identified

4    someone who stopped banking there after the robbery.

5          It identified someone who the government tells me

6    that witnesses will identify as someone they recognize from

7    the bank robbery surveillance photos.  It identified someone

8    who the government tells me witnesses will testify that owned

9    and wore a wig like the wig that was used or depicted in the

10   bank's surveillance photographs.  It identified someone who

11   the government tells me witnesses will testify that had and

12   wore the same type of FBI jacket as depicted in the bank

13   robbery photos.

14         It identified someone who the government tells me and

15   has proffered to me had a motive for the robbery based on

16   several factors, including the fact that this person felt

17   Xerox discriminated against them in terms of their employment

18   and fired them.  And someone who, at the time of the robbery,

19   was in a state of financial hardship with mounting bills and

20   no employment.

21         With respect to the second charge, the felon in

22   possession charge, there's no dispute that you had a

23   previously -- a previous felony conviction for bank robbery.

24   Because of that previous felony conviction, it is illegal for

25   you to possess a firearm or ammunition.

 1              The government has proffered to me that at a garage

 2     where several witnesses will testify that you stored your

 3     belongings and your belongings were found in that garage, a

 4     search warrant was executed and four semi-automatic rifles,

 5     two of which were loaded, were found with your belongings.

 6              And in a residence which you formerly resided in,

 7     from which you were evicted, although it appears you may have

 8     stayed there after the eviction, personal items belonging to

 9     you were found which included ammunition, ammunition clips, a

10     loaded shotgun and full body armor.  So, at least from my

11     point of view at this juncture, considering that factor, it

12     appears to me that the evidence on both these charges is very

13     strong against you.

14              The second factor I'm obligated to consider is the

15     nature and circumstances of the crime, you know, how serious

16     is the crime?  That's something that I need to consider in

17     deciding whether you should be released on bail.  And I think

18     no one would dispute that there is no more serious offense

19     than murdering someone or shooting someone during the course

20     of a robbery.  And the facts surrounding this particular

21     murder are extremely violent and heinous.

22              The third factor I have to consider is someone's

23     history and personal characteristics.  One of the things that

24     I'm obligated to consider is, has the person ever been in

25     trouble before?  And your criminal record is troubling.

1          You have at least three prior felony convictions,

2   including one for a bank robbery in which the suspect, meaning

3   you, was charged with using a weapon.  And you were convicted

4   of that crime in 1980.

5          The second felony conviction was in 1986 and you were

6   found guilty of possession of a sawed-off shotgun, which was a

7   felony and also guilty of carrying a concealed weapon, which

8   was a misdemeanor.  And the third felony crime was forgery,

9   which occurred in 1992 and for which you were sentenced to

10  five years incarceration, which sentence was suspended and I

11  think you received a term of probation.

12         So, you have three felony convictions and that,

13  obviously, is of some concern to the Court in terms of your

14  personal characteristics.  In addition, the facts of this case

15  and the criminal history indicate that you have an association

16  and affinity for weapons, guns, ammunition, body armor.  And

17  these facts also give the Court great pause in terms of your

18  danger to the community.

19         There are aspects of your history and characteristics

20  which give the Court concerns about your risk of flight.

21  There's a period of time that the government alleged to me

22  that you were on probation and you absconded from probation

23  for a period of five years, including improper and

24  unauthorized foreign travel to Japan.  That suggests to me

25  that if I was to release you and set reporting conditions,

1  that you may not follow those conditions because you have a

2  history of not reporting.  In addition, the government tells

3  me that these crimes carry with them a possible penalty of

4  life in prison and that too, in my mind, presents a potent

5  incentive to flee.

6          Finally, I have considered your bail proposal and

7  your family's willingness to post some equity and some homes

8  to secure your bail.  While I find that kind of family support

9  helpful, in this particular case, given all that I've talked

10  about, I conclude that it's inadequate, in my mind, to assure

11  either your future appearance or alleviate danger to the

12  community that you would present if released.

13          Therefore, on both indictments, I find the government

14  has demonstrated, by clear and convincing evidence, that no

15  combination -- or no condition or combination of conditions

16  will reasonably assure the safety of the community.  And as

17  proven by a preponderance of the evidence, that no condition

18  or combination of conditions would reasonably assure your

19  future appearances or alleviate the risk of flight you present

20  if released.  Therefore, the government's motion to detain you

21  is granted.

22          Now, you have the right to have my decision reviewed

23  by Judge Siragusa or another District Court Judge.  By law,

24  that judge must evaluate the evidence presented and the record

25  here de novo, which means take a fresh look at it.  Ms. Burger

 1 | is very familiar with the process to do that and I'm sure

 2 | she'll explain it to you.  I take no offense if you want my

 3 | decision reviewed.  And if you do, I would encourage you to do

 4 | it.  Because you're incarcerated now, I'll do everything in my

 5 | power to move the case along as quickly as I can, given -- I

 6 | know your lawyer's interest and the government's interest in

 7 | protecting your rights as we go through this prosecution.  So,

 8 | I believe we have a motion schedule in place?

 9 |             MS. BURGER:  We don't.  We have a status for

10 | discovery.

11 |             THE COURT:  Okay.  And I believe the time is excluded

12 | until that status conference?

13 |             MS. BURGER:  Yes.

14 |             THE COURT:  All right.  Anything else we need to do?

15 |             MR. GREGORY:  No, Judge.  Thank you.

16 |             THE COURT:  All right.  Thank you.  Court adjourned.

17 | (Proceedings ended.)

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |

1            *     *     *     *     *     *     *

2

3            I certify that the foregoing is a

4       correct transcription of the proceedings

5       recorded by me in this matter.

6

7

8

9                           s/ Megan E. Pelka, RPR

10                          Court Reporter,

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25