**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

**UNITED STATES OF AMERICA**                    **17-cr-6016-CJS-JWF**

         **v.**                    **NOTICE OF MOTION**

**RICHARD LEON WILBERN,**

         **Defendant.**

_____

| | |
|---|---|
| **MOTION BY**: | Anne M. Burger, Assistant Federal Public Defender, Attorney for Richard Leon Wilbern. |
| **DATE, TIME & PLACE**: | October 23, 2018, at 10:00 a.m., before the Honorable Jonathan W. Feldman, U.S. Courthouse, Rochester, New York. |
| **SUPPORTING PAPERS**: | Affirmation of Anne M. Burger, affirmed on July 31, 2018, the attachments hereto, and all prior proceedings had herein. |
| **RELIEF REQUESTED**: | An Order suppressing evidence as requested herein. |

Dated:  July 31, 2018
        Rochester, New York

                               /s/Anne M. Burger_____
                               Anne M. Burger
                               Assistant Federal Public Defender
                               28 East Main Street, Suite 400
                               Rochester, New York 14614
                               585-263-6201
                               anne_burger@fd.org
                               Attorney for Richard Leon Wilbern

TO:   Douglas Gregory, AUSA
       Joel L. Violanti, AUSA
       Paul C. Parisi, AUSA

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

**UNITED STATES OF AMERICA**             **17-cr-6016-CJS-JWF**

       **v.**                                    **AFFIRMATION**

**RICHARD LEON WILBERN,**

           **Defendant.**

_____

      Anne M. Burger, Assistant Federal Public Defender for the Western District of New York, affirms as follows:

      1.     I am an attorney licensed to practice law in the State of New York and the United States District Court for the Western District of New York, and I represent Richard Leon Wilbern.

      2.     I am familiar with this case by reasons of my investigation of this matter, conversations with my client and others, and my review of the discovery material provided to date by the government.

      3.     This affirmation is submitted in support of the relief requested herein, and is based upon the facts as I know them, the Federal Rules of Criminal Procedure, the Federal Rules of Evidence, the United States Constitution, and other pertinent statutes and law.

## RELATING TO DISCOVERY AND *BRADY*

4.      The defense is still receiving discovery and *Brady* material on an on-going basis from the government. When this process is complete additional motions may be filed to the extent disputes arise. Pertinent to the motions here, the defense has requested the disclosure of reports of all nonconforming events at the Office of the Chief Medical Examiner of New York City ["OCME"], responsible for the DNA testing and analysis here, from 2011 through 2017 relating to chain of custody and DNA testing and analysis. This material would not only be discoverable it would also be considered *Brady*. The government appears to have encountered a roadblock on this topic with the OCME. The OCME has indicated that it is willing to disclose only the materials relating to Craig O'Connor and Michele Egerman but only under a protective order. The sample protective order supplied to the government by the OCME is attached as Exhibit A.

5.      It is hoped that the parties will be able to resolve this outstanding issue but the defense brings it to the Court's attention in the event, in the future, a motion must be filed for the Court's intervention.

## MOTION TO SUPPRESS EVIDENCE

**Introduction**

6.      The government has not filed a Rule 12 notice in connection with this indictment. It has filed a Rule 12 notice in connection with Case Number 17-CR-6017.

In Exhibit A to the government's December 29, 2017, Rule 12 notice, the government

identified the discovery materials it intends to use at trial:

> Through the process of discovery, the government
> has provided photographs, video recordings,
> scientific laboratory reports, police reports (state
> and local), FBI 302s, FBI 1A reports, audio
> recordings, transcripts, business records, notes,
> charts and other items, all pursuant to its general
> discovery obligations under Rule 16. These items
> were described and Bates stamped as Lead Sheets
> 1-1146, and provided on two external hard drives
> supplied to the government by the defendant. A
> copy of each hard drive provided to the defense has
> been maintained by the government. The
> government has also provided certain hard copy
> documents and records which were also further
> catalogued and Bates stamped. The government
> intends to rely upon that evidence at the time of
> trial in its case-in-chief.

7.     In the notice and attached exhibit the government said that it would

use "certain" evidence obtained from the following search warrants:

1. Toshiba Laptop Serial Number 3A679870K;
2. Acer Laptop Serial Number LUS050B2289122BF8B2547;
3. iOmega portable hard drive Serial Number YAFB182064;
4. Samsung Galaxy (SGH-T999);
5. Apple Iphone 6S Plus, Model A 1687, FCC ID BCG-E2944A
6. Vehicle Search Warrant – 2005 GMC Savana Van
7. Residential Search Warrant – 27 Tubman Way, Rochester, New York.

8.     The government has not yet identified which of these items it intends

to offer as evidence at trial in the instant case. However, at a minimum it is

anticipated that the seized firearms and firearm-related items seized from the

garage at 27 Tubman Way will be offered by the government at trial here.

4

9.      Should the government provide a Rule 12 notice in connection with this case in the future or, in the alternative, confirm which, if any, of these additional items it actually intends to introduce at trial in this case, the defense reserves the right to either adopt motions seeking suppression of these materials in Case Number 17-CR-6017 or, in the alternative, file additional motions to suppress.

### THE COURT SHOULD SUPPRESS THE EVIDENCE SEIZED FROM THE GARAGE AT 72 TUBMAN WAY, ROCHESTER, NEW YORK

10.      Mr. Wilbern maintained a reasonable expectation of privacy in the garage at 27 Tubman Way, Rochester, New York. *See* affidavit of Richard Wilbern, Exhibit B.

11.      A search warrant was issued by this Court on September 27, 2016, authorizing the search of the garage at 27 Tubman Way.   *See* Exhibit C.   The warrant was based on the application of FBI Task Force Officer Andrew Jasie. *See* Exhibit D. The search resulted in the seizure of objects described in the discovery materials including, as relevant here, firearms and firearm-related items.

12.      The Fourth Amendment to the United States Constitution provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."   U.S. Const. amend. IV; *see also* Fed. R. Crim. P. 41.   The clear language

5

of the Fourth Amendment requires that a warrant be issued only upon probable

cause.

13.     In the case at bar, the evidence should be suppressed because the

affidavit submitted in support of the warrant was misleading and contained

material omissions which were necessary to the finding of probable cause.

**THE AFFIDAVIT IN SUPPORT OF THE WARRANT WAS MISLEADING AND CONTAINED MATERIAL OMISSIONS; A *FRANKS V. DELAWARE*, 438 U.S. 154 (1970), HEARING SHOULD BE ORDERED.**

14.     Where the defendant makes a substantial preliminary showing that a

false statement knowingly and intentionally, or with reckless disregard for the

truth, was included by the affiant in the warrant affidavit, and if the allegedly false

statement is necessary to the finding of probable cause, the Fourth Amendment

requires that the hearing be held at the defendant's request.   *Franks v. Delaware*,

438 U.S. 154, 155-156 (1978).

15.     The search warrant here was issued without probable cause as FBI

Task Force Officer Andrew Jasie's affidavit contained misleading statements and

material omissions. *See* Exhibit D.

16.     Jasie described his lengthy history in law enforcement both with the

FBI and the New York State Police interns of training and experience relating to

"homicide, bank robbery, drug trafficking, fugitives, and Hobbs Act robbery." *Id*. In

addition to his own training and experience, Jasie specifically relied upon the

experience and training "of other law enforcement agents who are participating in

this investigation" as "the basis for the opinions and conclusions" in his affidavit. *Id*.

Jasie outlined the commission of the crime on August 12, 2003, and the ongoing

investigation since that time by the FBI, Webster Police Department, Monroe

County Sheriff's Office, New York State Police, Rochester Police Department and

the U.S. Marshals Service. *Id*. In support of his claimed probable cause regarding

Mr. Wilbern, Jasie cited various factors, summarized as follows:

1.   An FBI expert opined that the perpetrator' was
     "approximately 6' tall" consistent with "several
     witnesses who indicated the Subject was
     approximately 6' tall and weighed 200 pounds." *Id*.[1]

2.   Shortly after a March 2016 press conference, a
     tipster contacted the FBI to report that he
     recognized the photographs of the perpetrator as
     "likely" being Richard Wilbern, with whom he'd had
     "significant interaction" while the two worked at
     Xerox. *Id*.[2]  The tipster thought Mr. Wilbern's son
     attended Fairport High School, that Mr. Wilbern
     had been fired by Xerox and also that Wilbern had
     sued Xerox for racial discrimination and, during
     the lawsuit told the tipster that he was "going to
     get his money." *Id*. Subsequent investigation
     confirmed Mr. Wilbern's employment and
     termination from Xerox and his unsuccessful
     lawsuit against Xerox. *Id*. The investigators also
     learned that Mr. Wilbern had checking and savings
     accounts with the Xerox Federal Credit Union as of
     the date of the 2003 robbery. *Id*.

3.   Jasie also reported that Mr. Wilbern's son, a
     student at Fairport High School from the 2000-

---

[1] Jasie did not disclose in his affidavit that the eyewitnesses to the robbery offered widely varying accounts of the height of the perpetrator.

[2] Jasie offered no explanation in his affidavit for why the tipster had failed to come forward years earlier.

2001 school year to the 2002-2003 school years, never returned to begin the 2003-2004 school year and was "truant every day from September 3 through September 30, 2003." He returned to Fairport for the 2004-2004 school year.

4.    Jasie next reported that Mr. Wilbern had a series of arrests and convictions beginning with his 1980 arrest for armed bank robbery in Irondequoit, a 1986 arrest for firearms offenses and a January 7, 2004 arrest for receiving stolen property and fictitious vehicle registration in Ohio. Jasie noted that his height at the time of this arrest and on his New York State driver's license was 6 feet. *Id.*

5.    The lynchpin of Jasie's submission to the Court in support of the search warrant, however, related to DNA testing based upon the comparison of a sample the FBI tricked Mr. Wilbern into providing in 2016 and two samples from an umbrella left at the scene of the crime by the perpetrator and tested years earlier by the New York City Office of the Chief Medical Examiner [hereafter "OCME"].

6.    Jasie attests that the OCME "had developed the expertise and facilities necessary to perform a DNA testing technique, called High Sensitivity or Low Template DNA testing [hereafter "LCN DNA testing"][3], that enables testing to be performed on trace amounts of evidence. *Id.* He affirmed that the OCME had detected a sufficient amount of human DNA to allow it to perform this "High Sensitivity PCR DNA testing and comparison;" he explained that "PCR testing, more formally called polymerase chain reaction (PCR) is a technique used in molecular biology to amplify a single copy or a few copies of a piece of DNA across several orders of magnitude, generating large amounts of DNA by repeated cycles of copying the DNA loci." *Id.*

---

3 The testing is commonly referred to low copy number DNA testing.

7.      Jasie reported that the OCME "positively matched"
        Mr. Wilbern's DNA sample to its LCN DNA testing
        results from the two samples obtained from the
        umbrella. *Id.* The match likelihood for one of the
        samples was 1 in 6.80 trillion people and the other
        1 in 138 million people according to the OCME. *Id.*

## Jasie's Misleading Statements and Omissions to the Court

17.     Jasie vouched for the reliability of the OCME's LCN DNA testing

procedure. He affirmed that the OCME "had developed the expertise and facilities

necessary to perform a DNA testing technique, called High Sensitivity or Low

Template DNA testing [hereafter "LCN DNA testing"], that enables testing to be

performed on trace amounts of evidence." *Id.* He went on to credit that the OCME

had detected a sufficient amount of human DNA to allow it to perform this testing

and sent the clear message to the Court that LCN DNA testing was every bit as

reliable as traditional, gold standard DNA testing.

18.     Jasie failed to mention in his affidavit that the FBI's DNA Casework

Unit ["DCU"] has researched LCN DNA testing strategies, and concluded that

"none have yet demonstrated the necessary reliability for use in forensic casework

by the DCU nor are any approved for uploading into the Combined DNA Index

System (CODIS)." *See* Exhibit E.

19.     Even outside of forensic casework, the FBI limits the use of LCN DNA.

More than 7 years after the LCN DNA testing done here in 2011, despite any

advancements in LCN DNA testing, the FBI limits the use of LDN DNA testing

records to

> DNA records developed from unidentified human
> remains and other single source samples from
> missing persons investigations or mass disasters
> using Low Template or Low Copy DNA Analysis
> validated in accordance with the QAS and
> SWGDAM Guidelines for STR Enhanced Detection
> Methods may be submitted to NDIS. No other DNA
> records developed using Low Template or Low Copy
> DNA Analysis shall be submitted to NDIS.

FBI Laboratory, National DNA Index System (NDIS) Operational Procedures

Manual, Version 7, Effective June 1, 2018, at p. 39, available at

file:///C:/Users/aburr/Downloads/lab-ndis-procedures-manual-version-7-060118.pdf

(last accessed July 29, 2018).

20.     Perhaps the most damning omission Jasie made was when he vouched

for the reliability of LCN DNA testing despite the conclusions by the Department of

Justice in December of 2011 that

> LCN analysis generally increases the risk of DNA
> typing inaccuracies and is not permitted in NDIS. .
> . Studies have shown that LCN analysis can
> profoundly alter the performance characteristics of
> the PCR and result in demonstrable losses of
> fidelity and reproducibility.

*See* Exhibit F at p. 40.[4]  Another Assistant United States Attorney perhaps said it

best when, in describing LCN DNA testing, he argued: "[w]hen the nation's premier

---

4 The government in *MacDonald* referred to "LCN" DNA testing as a
methodology by which items of evidence may be tested for "Touch DNA": "LCN
analysis is an enhancement strategy used for items of evidence potentially
containing 'touch DNA.'" *See* Exhibit F at p. 40.

10

forensic laboratory refuses to conduct Touch DNA testing, the proposed DNA testing has not been demonstrated to use scientifically sound methods that are also consistent with accepted forensic practices." *Id.* at p. 30.

21.     Jasie also created the erroneous impression that LCN DNA testing, because it uses the familiar PCR process, is 'garden variety,' traditional DNA testing. Traditional PCR testing, on the contrary, is the gold standard for identification and relies upon an optimal quantity of DNA ranging from 200 pg to 2-3 ng of DNA before amplification. *See* Exhibit G at p. 2.

22.     One human cell contains roughly six pg of DNA. *See* http://bionumbers.hms.harvard.edu/bionumber.aspx?id=111206 (last accessed July 29, 2018). By extrapolation, the gold standard PCR DNA testing process is based upon a low end input DNA quantity that ranges from more than double to more than ten times greater than the two samples tested by the OCME in this case.

23.     Jasie did not reveal to this Court that the FBI had previously determined that LCN DNA testing was unreliable in part *because it relied on the testing of such miniscule quantities of DNA, in contrast to traditional testing*.

24.     LCN DNA testing necessarily involves the PCR process however the analysis is modified "to increase test sensitivity including the increase of amplification cycles in PCR and post amplification purification of the DNA samples." *See* Exhibit H at p. 2. With LCN DNA testing, DNA types "can randomly 'drop out' and drop in,' resulting in an incomplete and/or erroneous profile which

can compromise the reliability of the typing system." *Id*. at p. 2. Moreover, artifacts

of the "analysis method may become more prominent and have a heightened chance

of being misinterpreted as part of the true DNA profile. . . Because of these factors

LCN typing results are generally not reproducible and by its nature [are] less

robust than traditional STR analysis." *Id*.

      25.    In addition to these problems,

> [o]ne of the fundamental limitations of the LCN
> approach on items of evidence containing 'touch
> DNA' is that results typically exhibit a combination
> of the various individuals who have handled an
> item, not exclusively those individuals involved in a
> criminal act. There is also a greater opportunity for
> adventitious transfer of DNA in the field. . . as well
> as during the manufacture of reagents and
> consumables that are used in testing. As a result,
> the potential exists for these materials to contain
> low-level biological contaminants that may be
> detected together with, or instead of, sample DNA.
> It may be impossible to determine if a LCN DNA
> profile is derived from primary or secondary
> transfer, casual contact, or from 'background' DNA.

*Id*. at p. 3.

      26.    In light of the above, Jasie submitted a false and/or misleading

statement and omitted material facts knowingly and intentionally, or with reckless

disregard for the truth. His statements regarding the DNA testing were necessary

to the finding of probable cause. The Court should order a *Franks* hearing and,

following the hearing, issue an order suppressing the evidence as it was obtained in

violation of Mr. Wilbern's Fourth Amendment rights.

## CONCLUSION

27.     In light of the foregoing, the Court should issue the relief requested.

Mr. Wilbern respectfully requests the opportunity to supplement this pleading

should the government's response raise additional issues of fact or law not

sufficiently addressed herein.


Dated:   July 31, 2018
         Rochester, New York

                              Respectfully submitted,


                                   /s/Anne M. Burger
                              Anne M. Burger
                              Assistant Federal Public Defender
                              28 E. Main Street, Suite 400
                              Rochester, New York 14614
                              585-263-6201
                              anne_burger@fd.org
                              Attorney for Richard Wilbern

 TO:  Douglas Gregory, AUSA
      Joel L. Violanti, AUSA
      Paul C. Parisi, AUSA