UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK



UNITED STATES OF AMERICA,
　　　　　Plaintiff,


v.


RICHARD LEON WILBERN,
　　　　　Defendant.

**DECISION AND ORDER
AND REPORT AND
RECOMMENDATION**
17-cr-6016-CJS-JWF
17-cr-6017-CJS-JWF

<u>Preliminary Statement and Procedural History</u>

Presently before the Court are Richard Leon Wilbern's ("the defendant" or "Wilbern") pre-trial motions. On January 24, 2017, a federal grand jury returned two indictments against the defendant, each appearing in a separate criminal action against the defendant. The first indictment charges Wilbern with being a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). 17-cr-6016, Docket # 6. The second indictment charges Wilbern with credit union robbery in violation of 18 U.S.C. § 2113(a), (e) and with murder with a firearm in furtherance of a crime of violence in violation of 18 U.S.C. §§ 924(c)(1)(A)(iii) and 924(j)(1). 17-cr-6017, Docket # 15.

The defendant filed numerous pre-trial motions as reflected in the following chart:[1]

---

[1] By Order of Hon. Charles J. Siragusa, United States District Judge, dated January 24, 2017, all pretrial matters in this case have been referred to the Court pursuant to 28 U.S.C. §§ 636(b)(1)(A)-(B). <u>See</u> 17-cr-6016, Docket # 7; 17-cr-6017, Docket # 16.

1

| Document Name | 17-cr-6016 | 17-cr-6017 |
|---|---|---|
| Indictment | Docket # 6 | Docket # 15 |
| Motion for Disclosure of Pre-trial Material | Docket # 25 | Docket # 39 |
| Motion for Timely Disclosure of Conflicts | | Docket # 76 |
| Motion to Dismiss Count 2 | | Docket # 77 |
| Motion to Change Venue | | Docket # 78 |
| Motion to Suppress Evidence (DNA) | Docket # 60 (Franks) | Docket # 80 (Franks; statements and DNA sample) |
| Motion to Exclude Evidence and for Daubert Hearing | | Docket # 81 |
| Motion for Brady Disclosure and Suppression of ID Evidence | | Docket # 82 |
| Motion to Suppress Evidence (jail calls) | Docket # 74 | Docket # 103 |

Oral argument was held on these several motions on October 23, 2018 and January 22, 2019. At the oral argument, the Court resolved several of the pending motions and the Court now confirms the dispositions on those motions announced from the bench. The defendant's motion to Disclose Conflicts (17-cr-6017, Docket # 76) is **granted** to the extent the government has not already inquired as to whether any of its intended witnesses will present a conflict for the defense. The defendant's motion to change venue (17-cr-6017, Docket # 78) is deferred to the trial judge and is therefore **denied without prejudice to renew** before Judge Siragusa. Because

2

the trial judge will also address the motion to Exclude Evidence and Order a Daubert hearing (17-cr-6017, Docket # 81), as a motion in limine, that motion is likewise **denied without prejudice to renew** before Judge Siragusa.

The Court reserved decision on the defendant's remaining motions pending further briefing by the parties.  After reviewing the supplemental briefing, the following is my Report and Recommendation as to the defendant's remaining motions.

## Relevant Facts

According to the criminal complaint, on August 12, 2003, an armed robbery and homicide occurred at the Xerox Federal Credit Union ("XFCU") in Webster, New York.  See Compl. (17-cr-6017, Docket # 1) at 2.  The complaint alleges that Wilbern entered the XFCU around 9:45 a.m. dressed in a jacket bearing "FBI" on the front and back and carrying a briefcase and a "green and gray colored umbrella." Id. at 3-4.  He also wore a U.S. Marshals badge around his neck. Id.  After entering the XFCU, the defendant sat at a desk inside the cubicle of a female employee and placed an umbrella atop her desk. Id. at 4.  He insisted that he was there to conduct a security assessment and to stage a robbery. Id. Wilbern then took one handgun and one sawed-off shotgun or sawed-off rifle out of his briefcase as well as a bag which he told the employee to fill with money. Id.  The employee complied with his demand. Id.

The complaint alleges that Wilbern began to order employees and customers to lay down on the floor. Around this time, customer Raymond Batzel ("Batzel") had a verbal altercation with Wilbern and Wilbern shot him in the neck. Id. Batzel later died of his injuries. Id. Another customer who entered the XFCU while the crime was occurring and witnessed Batzel get shot tried to flee and was shot in the back. Id. at 4-5. He was treated for his injuries and survived. Id. at 5. Wilbern directed XFCU employees to fill a bag with money while holding a firearm in the air. Id. He then left the XFCU without the umbrella. Id. The umbrella was recovered by law enforcement and placed into evidence. Id.

Years later, following a press conference held on March 21, 2016 to elicit additional leads in the stale investigation, a citizen contacted the FBI with information relevant to the investigation. Id. at 6. The citizen, who had worked with Wilbern when he was an XFCU employee, identified Wilbern as a potential suspect. Id. Wilbern had been terminated from employment and filed a Title VII employment discrimination lawsuit in the Western District of New York against XFCU that was ultimately dismissed. Id. at 6-8. The citizen also knew that the defendant's son attended high school in Fairport, New York. Id. Law enforcement was able to confirm the information the citizen provided. Id.

After the credit union robbery, the umbrella the defendant left behind was eventually swabbed for DNA samples.[2]  Id. at 10. The defendant was arrested on September 27, 2016 (17-cr-6017, Docket # 7) and indicted on January 24, 2017 (17-cr-6016, Docket # 6; 17-cr-6017, Docket # 15).  These several pending motions were filed between July 31, 2018 and January 3, 2019.

## Discussion

### Motion to Dismiss Count 2 of the Indictment
### (17-cr-6017, Docket # 77)

The second count of the Indictment accuses Wilbern of killing Raymond Batzel with a firearm in furtherance of a crime of violence in violation of 18 U.S.C. § 924(c)(1)(A)(iii), (j)(1).  Wilbern moves to dismiss this count of the Indictment on the grounds that that the crime of violence alleged in the Indictment, that is bank robbery in violation of 18 U.S.C. §§ 2213(a) and (e), does not qualify as a crime of violence under the Armed Career Criminal Act ("ACCA") and that the residual clause is unconstitutionally vague. 17-cr-6017, Docket # 77, at 3-4.

A "crime of violence" for purposes of 18 U.S.C. § 924(c)(1)(A)(iii) is defined as a felony level offense that:

> (A) has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or

---

[2] See below for discussion of the DNA evidence.

> (B) that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

18 U.S.C. § 924(c)(3) (emphasis added).

Thus, there are two distinct ways a crime can meet the definitional requirements of § 924(c)(1)(A)(iii). Subsection (A), known as the "elements" or "use of force" clause, focuses on the elements of the underlying criminal offense and whether that crime "has as an element the use, attempted use, or threatened use of physical force." Subsection (B), known as the "residual clause" or the "risk of force" clause looks not to the elements of the underlying offense, but rather to the specific conduct involved in committing the charged offense. That is, did the specific conduct of the defendant "by its nature" involve a "substantial risk that physical force" might be used in committing the offense?

In evaluating this claim, the Court need not and will not engage in an extensive analysis of the "void for vagueness" arguments emanating from recent Supreme Court cases discussing whether various definitional language regarding "crimes of violence" pass constitutional muster. See Sessions v. Dimaya, 138 S. Ct. 1204 (2018); Johnson v. United States, 135 S. Ct. 2551 (2015). Suffice it to say that since Johnson and Dimaya, the Second Circuit has issued decisions binding on this Court which compel my recommendation that the defendant's motion to dismiss Count 2 be denied.

As to subsection (A), last week the Second Circuit held that a credit union robbery, whether committed by force, violence, or intimidation in violation of 18 U.S.C. § 2113(a) categorically constitutes a predicate "crime of violence" under the "use of force clause." United States v. Hendricks, No. 15-2525-cr, 2019 WL 1560582, at *5 (2d Cir. Apr. 11, 2019) ("We thus have little difficulty in holding that bank robbery committed 'by intimidation' categorically constitutes a crime of violence for the purposes of § 924(c)(1)(A), and, therefore, that Robert's conviction for using a firearm during a crime of violence under § 924(c)(1)(A)(ii) does not constitute error, much less 'plain error.'"). I believe Hendricks effectively forecloses any defense argument that a violation of 18 U.S.C. § 2113(a) is not a crime of violence under any of the punishment provisions of § 924(c)(1)(A).[3]

As to subsection (B), based on the Second Circuit's decision in United States v. Barrett, 903 F.3d 166 (2d Cir. 2018), I am compelled to similarly recommend denial of the defendant's motion to dismiss Count 2. In Barrett, the Second Circuit held that even if a charged crime - in Barrett, the crime at issue was Hobbs Act

---

[3] Wilbern is charged with violating § 2113(a) and § 2113(e). Section 2113(e) provides for "enhanced penalties" for a bank robbery conviction under § 2113(a) where the bank robbery also involves aggravated conduct such as kidnapping or murder. Whitfield v. United States, 135 S. Ct. 785, 787 (2015). Wilbern argues that § 2113(e) itself does not qualify as a "crime of violence" as defined in § 924(c)(3). See Docket # 77, at 15. To the extent that argument survives Hendricks, it can be addressed by the use of the special interrogatory procedure endorsed by the Second Circuit in United States v. Barrett, 903 F.3d 166, 182 (2d Cir. 2018).

conspiracy – was not a crime of violence when evaluated on a traditional categorical application of subsections (A) or (B) of § 924(c)(3), a "conduct specific" approach to the crime of violence analysis would avoid the "constitutional concerns identified in Dimaya and Johnson." Id. at 178.

> Section 924(c)(3)(B) can be applied to a defendant's case-specific conduct, with a jury making the requisite findings about the nature of the predicate offense and the attending risk of physical force being used in its commission. Such a conduct-specific approach avoids both the Sixth Amendment right-to-trial and due process vagueness concerns identified in Dimaya and Johnson.

Id.[4] In other words, by using special interrogatories that require the jury to make a crime of violence factual determination based on the defendant's "real world conduct," the trial judge will be able to protect Wilbern from "not only the constitutional vagueness concerns that Dimaya and Johnson located in the categorical ordinary-case standard, but also the Sixth Amendment right-to-trial concern that originally prompted the Supreme Court to mandate a categorical approach to residual definitions of crimes of violence." Id. at 179.[5] It would be up to Judge Siragusa to

---

[4] In its recent decision in Hendricks, the Second Circuit declined to consider whether bank robbery by "intimidation" categorically constituted a crime of violence within the meaning of § 924(c)(3)(B). 2019 WL 1560582, at *5 n.36. Because the government has represented to this Court that, pursuant to Barrett's "conduct specific" approach, it will ask Judge Siragusa to utilize special interrogatories in reaching any verdict under § 924(c)(3)(B), this Court need not opine on that issue either.

[5] During oral argument, Wilbern's counsel argued that Barrett was "wrongly decided." See 17-cr-6017, Docket # 99, at 21. To the extent the defendant needs to preserve the issue, that has been accomplished.

determine the appropriate definitional language that would be used in the special interrogatory procedure adopted in <u>Barrett</u>.  <u>See,</u> <u>e.g.</u>, <u>United States v. Pirk</u>, No. 1:15-CR-00142 EAW, 2019 WL 101808, at *8 (W.D.N.Y. Jan. 4, 2019).

For the above reasons, it is my Report and Recommendation that Wilbern's motion to dismiss Count 2 of the Indictment in 17-cr-6017 be **denied**.

<u>**Motion to Suppress Evidence and for *Franks* Hearing on the Basis**</u>
<u>**that Affidavit in Support of Search Warrant for 23 Tubman Way**</u>
<u>**was Based on Misleading Statements and Material Omissions (17-**</u>
<u>**cr-6016, Docket # 60; 17-cr-6017, Docket # 80)**</u>

The defendant claims that the affidavit of FBI Task Force Officer Andrew Jasie ("Jasie") in support of an application to search 23 Tubman Way[6] was misleading and contained material omissions and that, as a result, the Court should hold a <u>Franks</u> hearing and suppress evidence obtained pursuant to the warrant. Def.'s Mot. to Suppress and for <u>Franks</u> Hr'g, 17-cr-6016, Docket # 60; 17-cr-6017, Docket # 80 ("<u>Franks</u> Mot."). In his supporting affidavit, Jasie set forth the basis for probable cause to believe that Wilbern robbed the XFCU in 2003. Jasie averred that Wilbern met the physical description of the perpetrator, had accounts at the XFCU, had a series of convictions for other armed bank

---

[6] This location is identified in the defendant's moving papers as "72 Tubman Way" and "27 Tubman Way." The defendant asserts that he had an expectation of privacy at this location.

robberies and gun crimes, and that shortly after the crime, Wilbern's son was truant from school for a period of time. In addition, the affidavit laid out a tip from a concerned citizen identifying a disgruntled former Xerox employee, Wilbern, as the perpetrator. Jasie claimed that the perpetrator left an umbrella at the XFCU, which was swabbed and then tested for traces of DNA. The first test, completed shortly after the crime was committed, did not yield sufficient traces of DNA to develop a DNA profile.

The second test was completed from a separate swab sent to the New York City Office of the Chief Medical Examiner ("OCME") and conducted years later, in 2011. OCME used a technique called High Sensitivity or Low Copy Number DNA ("LCN DNA") testing, which enables testing to be performed, as here, on trace amounts of evidence. OCME performed tests on two swabs from the umbrella: one from the closure wrap around and one from the latch mechanism. Franks Mot., Exs. at 30. The LCN DNA testing performed on the wrap around revealed DNA from at least two people, but concluded that one male was the major contributor: Male Donor A. According to Jasie, "[t]he DNA profile of Male Donor A was a full profile. That DNA profile would be expected to be found in only 1 in 6.80 trillion people." Id. at 31. The LCN DNA testing performed on the latch mechanism resulted in a DNA profile that would be expected to be found in only 1 in 138 million people. Id. Despite having a prior conviction, Wilbern never provided a DNA sample for

law enforcement to compare to the DNA samples taken from the umbrella.  Id.

According to the affidavit supporting the search warrant, Wilbern called the FBI Public Access Line five times between July 14, 2015 and April 14, 2016.  Id. at 32.  In the calls, Wilbern claimed to be a victim of a suspected real estate scam involving his property located at 766 Hudson Avenue, Rochester, NY.  Id. FBI agents contacted Wilbern using the cell phone number he provided and Wilbern voluntarily agreed to come to the FBI Office in Rochester on July 7, 2016 to discuss the facts of the alleged fraud case.  Id.  Wilbern returned to the FBI Offices on July 19, 2016.  During this meeting, agents asked the defendant to sign paperwork and put documents in an envelope, which he sealed by licking the envelope.  Id.  Law enforcement immediately sent this envelope to OCME for DNA testing and comparison to the sample tested in 2011.  Id.  OCME determined that the sample taken from the envelope positively matched the DNA profile of Male Donor A found on the umbrella wrap around and the DNA profile found on the umbrella latch.  Id. at 33.

The defendant argues that Jasie's affidavit omits critical information about the LCN DNA testing procedure, requiring that the Court hold a Franks hearing.  He claims that Jasie "vouched" for LCN DNA testing and "sent the clear message . . . that LCN DNA testing was every bit as reliable as traditional, gold standard

DNA testing," despite reports and information that indicate it may be more unreliable.  Franks Mot. at 9.

In response, the government argues that Wilbern "concoct[s] an argument to make it fit within the Franks context" by claiming that Jasie "vouched" for the reliability of LCN DNA testing and procedure, when in reality, Jasie was not formulating an opinion about the probity of LCN DNA testing but was simply reporting the facts as he knew them.  Gov't's Resp., 17-cr-6017, Docket # 84, at 46.  "TFO Jasie didn't intentionally mislead the court, nor did he 'vouch' for anything - he merely repeated the scientific information which was provided by the OCME laboratory through the production of their case reports."  17-cr-6017, Docket # 84, at 47.  According to the government, Jasie simply relayed scientific results and conclusions provided to him "by a reputable laboratory, results he believed, in good faith, to be accurate."  17-cr-6017, Docket # 84, at 48-49.

The affiant's intent to mislead is a critical part of the Franks analysis.  The Second Circuit has instructed that:

> To be entitled to a Franks hearing, a defendant must make a 'substantial preliminary showing' that: (1) the claimed inaccuracies or omissions are the result of the affiant's deliberate falsehood or reckless disregard for the truth; and (2) the alleged falsehoods or omissions were necessary to the judge's probable cause finding. If, after setting aside the allegedly misleading statements or omissions, the affidavit, nonetheless, presents sufficient information to support a finding of probable cause, the district court need not conduct a Franks hearing.

12

United States v. Salameh, 152 F.3d 88, 113 (2d Cir. 1998) (internal citations omitted); see also United States v. Canfield, 212 F.3d 713, 717 (2d Cir. 2000) (applying this standard to conclude that the corrected affidavit supported probable cause).

Here, Wilbern has made an insufficient showing that the claimed inaccuracies or omissions were the result of Jasie's deliberate falsehood or reckless disregard for the truth. Indeed, Wilbern has not put forth any evidence that Jasie knew or should have known that LCN DNA was not reliable, at least partially because it is not at all clear that LCN DNA evidence is in fact unreliable, as the defendant contends. See United States v. Morgan, 53 F. Supp. 3d 732, 741 (S.D.N.Y. 2014) (finding, under Federal Rule of Evidence 702 and Daubert, that OCME LCN DNA test results were reliable). But see People v. Collins, 49 Misc. 3d 595, 628-29 (Sup. Ct. Kings Cty. 2015) (concluding that, at the time, LCN DNA testing was not reliable under New York's more stringent Frye test). Indeed, the defendant has not explained why, if LCN DNA testing is unreliable, it resulted in a complete match to the defendant's envelope sample. Nor has the defendant made a "substantial preliminary showing" that, even if it is unreliable, Jasie knew or should have known as much when he submitted his affidavit.

In United States v. Lonardo, this court addressed whether a Franks hearing was required where an affidavit submitted in support of a search warrant failed to include "conflicting views of the utility of thermal imaging in detecting marijuana grow operations," technology upon which the articulated probable cause was based.  No. 10-cr-6226, 2012 WL 3685958, at *5 (W.D.N.Y. June 27, 2012).  In Lonardo, this Court found that the affiant was not "required to question or conduct an independent evaluation of . . . [the] factual findings and expert opinion before relying upon" the results when applying for the search warrant.  Id.  Nor was the affiant "required to independently determine whether thermal imaging was 'junk science' before submitting the search warrant application."  Id.  Like the affiant in Lonardo, Jasie was not required to question the utility or precision of LCN DNA testing.  Nor was Jasie required to independently investigate or opine on the science underlying such testing.

Even assuming arguendo that Jasie recklessly omitted material information from the affidavit, the omission was "inconsequential to the finding of probable cause," and therefore a Franks hearing is not necessary.  United States v. Longo, 70 F. Supp. 2d 225, 254 (W.D.N.Y. 1999) (where alleged misrepresentations and omissions in the supporting affidavit were "inconsequential to the finding of probable cause," Franks hearing unnecessary).  That LCN DNA testing may have some features that some may find unreliable does not by

itself change the existence of probable cause here.  Probable cause does not mean complete certainty.  United States v. Benedict, 104 F. Supp. 2d 175, 181 (W.D.N.Y. 2000) ("A finding of probable cause is based on probabilities, and need not rise to the level of a virtual certainty.").  Accordingly, Jasie's alleged omissions with respect to the apparent unreliability of LCN DNA testing do not require a Franks hearing and it is my Report and Recommendation that the defendant's motion to suppress and for a Franks hearing (17-cr-6016, Docket # 60; 17-cr-6017, Docket # 80) be **denied.**

## Motion to Suppress Statements and DNA Sample
## (17-cr-6017, Docket # 80)

The defendant next asks that the statements he made at FBI offices be suppressed because they were involuntarily made and that the DNA sample the defendant produced to the FBI be suppressed because it was obtained by deception and "trickery."  17-cr-6017, Docket # 80, at 14-15.  Wilbern contends that the government invited him to FBI offices where they obtained statements and asked him to lick an envelope, leaving behind his DNA for the FBI to compare against samples left at the XFCU.

The government concedes that Wilbern was invited to FBI offices "in large part to fully identify him, his personal vehicle and to potentially obtain a DNA sample for comparison against the known sample developed in 2011."  17-cr-6017, Docket # 84, at 53.

However, the government contends that it was the defendant who first contacted the FBI and that he voluntarily came to the FBI offices and was never coerced into appearing or providing any statements.   I agree with the government.

Statements: With respect to Wilbern's statements at the FBI offices on July 7 and 19, 2016 and September 27, 2016, there is no evidence that the defendant was in custody at the time he made the statements or that the statements were in any way involuntarily made or coerced.

"A [custodial statement] is admissible under the Constitution only if it is made voluntarily." United States v. Orlandez-Gamboa, 320 F.3d 328, 332 (2d Cir. 2003). Accordingly, in addition to establishing that the defendant knowingly and voluntarily waived his Miranda rights, "the government must also establish that the defendant's statements were not made involuntarily within the meaning of the Due Process Clause." United States v. Tuttle, No. 13-CR-6109-FPG, 2014 WL 3695475, at *12 (W.D.N.Y. July 24, 2014) (citing Dickerson v. United States, 530 U.S. 428, 433 (2000) (recognizing that there are "two constitutional bases for the requirement that a confession be voluntary to be admitted into evidence: the Fifth Amendment right against self-incrimination and the Due Process Clause of the Fourteenth Amendment.")).

"When, as here, a defendant seeks to suppress non-custodial statements made to law enforcement authorities, the single issue

16

before the court is whether the statements were voluntary, i.e., the 'product of an essentially free and unconstrained choice by [their] maker.'" United States v. Haak, 884 F.3d 400, 409 (2d Cir. 2018) (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 225, (1973)). In making the voluntariness determination, no single criterion controls; instead, the Court should consider the "totality of the circumstances" surrounding the particular interrogation at issue. Arizona v. Fulminante, 499 U.S. 279, 286 (1991). "Relevant factors that should be considered include the accused's age, his lack of education or low intelligence, the failure to give Miranda warnings, the length of detention, the nature of the interrogation, and any use of physical punishment." Campaneria v. Reid, 891 F.2d 1014, 1020 (2d Cir. 1989), cert. denied, 499 U.S. 949 (1991); see also Green v. Scully, 850 F.2d 894, 901-02 (2d Cir. 1988) ("In applying the totality of the circumstances test, those factors that a court should consider to determine whether an accused's confession is voluntary center around three sets of circumstances: (1) the characteristics of the accused, (2) the conditions of interrogation, and (3) the conduct of law enforcement officials."), cert. denied, 488 U.S. 945 (1988). In short, "[a] confession is not voluntary when obtained under circumstances that overbear the defendant's will at the time it is given." United States v. Anderson, 929 F.2d 96, 99 (2d Cir. 1991); see also Colorado v. Connelly, 479 U.S. 157, 167 (1986)

("[C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment."). "[T]races of . . . brutality, psychological duress, threats, or unduly prolonged interrogation," for example, give rise to a finding of involuntariness. United States v. Moore, 670 F.3d 222, 233 (2d Cir. 2012) (internal quotations and alterations omitted).

None of Wilbern's statements at the FBI offices were custodial because he sought out a meeting with the FBI, came willingly to the FBI offices, was never told he was under arrest, and left freely. See Oregon v. Mathiason, 429 U.S. 492, 495 (1977) (finding that suspect was not in custody when he "came voluntarily to the police station, where he was immediately informed that he was not under arrest. At the close of a 1/2-hour interview respondent did in fact leave the police station without hinderance"); Haak, 884 F.3d at 402 (noting that parties agreed that defendant was "never in custody" when police asked him to come to police station, he voluntarily did so, and left approximately 40 minutes later).

Moreover, the totality of the circumstances makes clear that the defendant's statements were not coerced and his will was not overborne. Again, it was Wilbern who initiated contact with the FBI and thereafter he voluntarily accepted multiple invitations to speak to the agents. Wilbern claims that his statements were involuntary because they were elicited under false pretenses,

i.e., under the assumption that the FBI would help investigate a fraud he alleged was committed against him.   However, under the facts presented here, this argument is not particularly persuasive.   The Fifth Amendment forbids "affirmative misrepresentations by the police." Anderson, 929 F.2d at 100 (finding that police statements during custodial interrogation that defendant would lose ability to cooperate may have created a false sense that defendant must confess at that moment or forfeit any future benefit he may derive from cooperating).   But "[p]loys to mislead a suspect or lull him into a false sense of security that do not rise to the level of compulsion or coercion to speak" do not render a defendant's statements involuntary.   Illinois v. Perkins, 496 U.S. 292, 297 (1990).   In the context of waiving Miranda rights, the Supreme Court has held that

> a valid waiver does not require that an individual be informed of all information useful in making his decision or all information that might affect his decision to confess. . . . We have never read the Constitution to require that the police supply a suspect with a flow of information to help him calibrate his self-interest in deciding whether to speak or stand by his rights.

Colorado v. Spring, 479 U.S. 564, 576-77 (1987) (quoting another source) (internal quotations, citations, and alterations omitted).

For example, in United States v. Okwumabua, the Second Circuit found that law enforcement's failure to inform a defendant that they were conducting a criminal investigation or that he was a

target did not render defendant's statement involuntary. 828 F.2d 950, 953-54 (2d Cir. 1987). The Second Circuit concluded that while the defendant there was not told he was under investigation, the statements he made were nevertheless "the product of [his] essentially free and unconstrained choice" and therefore voluntary. Id. at 954 (quoting another source).

Like in Okwumabua, the fact that law enforcement did not tell Wilbern that he was under investigation when he voluntarily came to the FBI's offices to discuss an alleged fraud perpetrated against him does not render his subsequent statements involuntary. That the defendant may have been lulled into a false sense of security as to why he was being questioned does not negate the fact that he made a free and unconstrained choice to seek out and talk to law enforcement.

DNA Sample: The same can be said for law enforcement's retrieval of a DNA sample from the defendant. The defendant claims that the FBI obtained the DNA sample by "deception" but never articulates exactly what law enforcement did to trick the defendant into providing his DNA. By inviting Wilbern to lick an envelope and then using that sample to perform a DNA comparison on the samples collected from the crime scene, law enforcement did not conduct an illegal search under the Fourth Amendment. I agree with the government's argument that "the defendant voluntarily relinquished his DNA without any force or compulsion, thus

abandoning any reasonable expectation of privacy." 17-cr-6017, Docket # 84, at 58. There was no trickery or deception in failing to forewarn the defendant that his DNA could tie him to a crime under active investigation. Accordingly, obtaining Wilbern's DNA under these circumstances did not constitute unlawful police coercion.[7]  See State v. Athan, 160 Wash. 2d 354, 362 (2007) (finding no Fourth Amendment violation where "detectives, posing as a fictitious law firm, induced [defendant] to mail a letter to the firm, from which [defendant]'s DNA sample was extracted"); People v. LaGuerre, 29 A.D.3d 820, 822 (2d Dep't 2006) (determining that the "police may engage in a ruse" as long as it is not so coercive as to deny due process, and that police detectives in that case "did not deprive the defendant of due process when they obtained a sample of his DNA from a piece of chewing gum he voluntarily discarded in the course of a contrived Pepsi taste test challenge"). But see State v. McCord, 833 So. 2d 828, 831 (Fla. Dist. Ct. App. 2002) (concluding that defendant's Fourth Amendment rights had been violated when law enforcement falsely

---

[7] While Wilbern may not have known the reason he was sealing the envelope, there is no question that he did so willingly and without force or coercion. No threats or promises were made to induce Wilbern to lick the envelope and he voluntarily left the envelope in the custody of the FBI, thereby relinquishing any continuing interest in it. "When a person voluntarily abandons property . . . he forfeits any reasonable expectation of privacy that he might have had in the property." United States v. Lee, 916 F.2d 814, 818 (2d Cir. 1990). Because the envelope was abandoned, law enforcement did not act improperly in recovering the envelope and obtaining the DNA sample. See Jones v. Meehan, No. 14 Civ. 6402(KPF), 2018 WL 459662, at *10 (S.D.N.Y. Jan. 16, 2018) (finding no Fourth Amendment violation in § 1983 action where law enforcement caused plaintiff to drink from a cup and then retrieved the discarded cup to obtain a DNA sample).

told him he was a suspect in a rape case so that he would provide a DNA sample).

Accordingly, it is my Report and Recommendation that Wilbern's motion to suppress statements and DNA samples (17-cr-6017, Docket # 80) be **denied**.

## Motion for *Brady* Disclosure and Suppression of ID Evidence (17-cr-6017, Docket ## 39, 82)

The defendant again seeks, pursuant to both Federal Rule of Criminal Procedure 16 and Brady, the disclosure and suppression of the identities of individuals who positively identified him as a suspect upon viewing still photographs taken from the bank surveillance video recorded on the date of the incident, as well as details about those identification ("ID") procedures.  17-cr-6017, Docket # 82.  The Court denies Wilbern's motion.

Oral argument was held on the motion for the disclosure of Brady material (17-cr-6017, Docket # 39) on March 2, 2018 (17-cr-6017, Docket # 43) which sought the disclosure of, inter alia, "[i]nformation including documents, scripts and photographs relating to the questioning of witnesses and display of surveillance photographs in an effort to obtain identifications of Richard Wilbern as the perpetrator."  17-cr-6017, Docket # 39, at 4.  The motion was resolved by an order of this Court filed on March 7, 2018.  17-cr-6017, Docket # 44.  The Court therein directed the government to provide to the defense all Brady

material in its possession as agreed to at the motion hearing no later than March 9, 2018, and additional Brady material on an on-going basis as it becomes aware of such information.

The government has already agreed to provide, for those witnesses that did not positively identify the defendant, the names of the witnesses; dates, times, and places at which the ID procedure occurred; the pictures used; and the corresponding law enforcement reports.  17-cr-6017, Docket # 82, at 5.  For those witnesses that did positively identify the defendant, the government agreed to provide all of the same information, except the names or other identifying details of the witnesses, as well as copies of the relevant police reports redacted to exclude identifying information.  Id.  The defense represents that

> the only information ultimately provided to the defense were the seven dates on which four witnesses are alleged to have made identifications, and a police report describing only one of those dates for only one of those witnesses. The government offered no explanation for the disclosure of details regarding one identification procedure with one witness while withholding the same information about the other three witnesses and six identification procedures.

Id. at 9.

The government said it "intends to present evidence at trial from five (5) individuals who will testify that they recognized the person in the surveillance photographs as the person they know as Richard Wilbern" and provided the photographs used and the dates on which the ID occurred.  17-cr-6017, Docket # 84, at 65-66.  The

23

government alleges that none of these people actually witnessed the crime, but rather that they are all "personally familiar" with the defendant.  Id. at 65.  The government intends to use these witnesses at trial to make in-court identifications of the defendant pursuant to Federal Rule of Evidence 701 pertaining to lay witnesses.  Id. at 63.  Thus, the government does not contest the scope of the March 2, 2018 agreement but now represents that it is not required to disclose the identification procedures it agreed to provide because Federal Rule of Criminal Procedure 16 does not require the government

> to release any Jencks material or 3500 materials relating to the statements or grand jury testimony provided by these witnesses, which includes testimony relative to their overall relationship and consequent familiarity with the defendant, as well as the timing and circumstances which led to their recognition of the defendant. The government has complied with its Brady obligations by disclosing the names of those individuals who failed to identify the defendant after viewing the FBI photographs.

Id. at 66.

Thus, the issue presented here is whether Wilbern is legally entitled to know the circumstances of the ID procedures prior to trial.  I am not convinced that he is.  "Absent a direct confrontation between a defendant and witnesses, such as a lineup, a defendant cannot know of such pretrial identification procedures as photographic spreads and surreptitious viewings unless the Government chooses to tell him." United States v. Mitchell, 540

F.2d 1163, 1166 n.3 (3d Cir. 1976); see United States v. Taylor, 707 F. Supp. 696, 704-05 (S.D.N.Y. 1989) ("[T]he court in Mitchell noted that the government was not required to supply prior to trial the names of any witnesses who had been shown a photographic spread or who were present at a preliminary hearing . . . . [T]he Mitchell court stated that the government is not required to disclose to a defendant the nature of pre-trial identification procedures."). The photographs the government used in the pretrial ID procedures must be disclosed, but the government represents, and defendant acknowledges, that the photographs shown to the witnesses have been produced. See Taylor, 707 F. Supp. at 705; 17-cr-6017, Docket # 82, at 4.

Further, the identities of the witnesses who gave a positive ID are not required to be disclosed prior to the production of the witness list for trial. United States v. Wei, 862 F. Supp. 1129, 1135 (S.D.N.Y. 1994) ("[Defendant's] requests for disclosure of all parties present, of all parties alleging recognition of him, the alleged basis for any recognition, and of all parties who did not recognize him are denied. Those requests would prematurely disclose the identity of government witnesses."); Taylor, 707 F. Supp. at 703 ("Defendant, however, is not entitled to a witness list. Rule 16 does not require the government to provide such information."); see 18 U.S.C. § 3500; Fed. R. Crim. P. 16. Given that the government has represented that it only intends to use

the individuals as lay witnesses pursuant to Federal Rule of Evidence 701, the question of the admissibility of the in-court ID testimony and information flowing from the ID procedures is an evidentiary question best determined by the trial judge.  United States v. McGee, No. 99-CR-150E, 2000 WL 1520957, at *4 n.2 (W.D.N.Y. Oct. 10, 2000) ("In a pretrial Wade hearing, the trial judge considers the admissibility of identification testimony." (citing United States v. Wade, 388 U.S. 218 (1967))); see Givens v. Burge, No. 02 Civ. 0842 JSRGWG, 2003 WL 1563775, at *1 (S.D.N.Y. Mar. 4, 2003) (in magistrate judge's report and recommendation, "the trial judge held a hearing pursuant to United States v. Wade, 388 U.S. 218 (1967), to determine the admissibility of Reid's in-court identification testimony.").

The defendant's motions for disclosure and suppression (17-cr-6017, Docket ## 39, 82) are **denied** with respect to disclosure of the pretrial identification procedures and witness identities, so long as the witness identities are properly disclosed in a witness list prior to trial, and are **denied without prejudice to renew** with respect to suppression of that evidence as best made in a motion in limine before Judge Siragusa.  The defendant's motion for disclosure (17-cr-6017, Docket # 39) is otherwise **granted** pursuant to the parties' agreement at the motion hearing.  See 17-cr-6017, Docket # 44.

## Motion to Suppress Jail Phone Calls (17-cr-6016, Docket # 74; 17-cr-6017, Docket # 103)

Citing the First Amendment and the Electronic Communications Privacy Act, 18 U.S.C. §§ 2510-2522 ("Title III"), the defendant moves to suppress recordings of phone calls he placed while in jail pending his trial on these charges.  17-cr-6016, Docket # 74, at 7.  The government has responded by submitting an affidavit from Charles W. Facteau ("Facteau"), a systems administrator for inmate phone services at the Monroe County Jail ("MCJ"), where the recordings were made.  17-cr-6016, Docket # 79-2.  Facteau avers that MCJ inmates are notified by a sign as well as an audio message that plays prior to commencing a jail call that their phone conversations are being recorded.  Id.  The government contends that this notification constitutes the defendant's consent to record the calls.  Under the circumstances presented here, I agree.

"In general, in the absence of judicial authorization, Title III prohibits the intentional interception of telephone calls and admission at trial of any recordings of unlawfully intercepted telephone calls."  United States v. Simmons, No. 13-CR-6025CJS, 2016 WL 285176, at *24 (W.D.N.Y. Jan. 22, 2016), report and recommendation adopted, No. 13-CR-6025, 2016 WL 1127802 (W.D.N.Y. Mar. 23, 2016).  However, "no violation of Title III occurs where the inmate has consented to the interception."  United States v. Anderson, No. 10-CR-6128, 2012 WL 3648189, at *4 (W.D.N.Y. May 29,

2012), report and recommendation adopted, No. 10-CR-6128, 2012 WL 3648142 (W.D.N.Y. Aug. 23, 2012). The same goes for the defendant's First Amendment claim. The defendant retains some constitutional rights, including a "right to communicate with people outside the prison walls" under the First Amendment. Simmons, 2016 WL 285176, at *24 (quoting United States v. Colbert, No. 08-411, 2011 WL 3360112, at *8 (W.D. Pa. Aug. 3, 2011)). Yet that right is not extended when a defendant has consented to the recording. See Simmons, 2016 WL 285176, at *25 ("[Defendant] received clear notice at each of the facilities that his telephone calls could or would be monitored or recorded, and his decision to initiate telephone calls despite that notice establishes his implied consent to the recording and monitoring of his telephone calls.").

Courts have acknowledged that "[s]uch consent may be express or implied through evidence that an inmate was notified that telephone calls were subject to monitoring or recording." Id. at *24. "[I]nmates impliedly consent to have their telephone conversations monitored where they have received notice of the surveillance and nevertheless use the prison telephones." United States v. Workman, 80 F.3d 688, 693 (2d Cir. 1996), cert. denied sub nom. Rodgers v. United States, 519 U.S. 938 (1996).

Here, the government has produced an unrebutted affidavit from Facteau representing that at the commencement of every call,

there is a verbal warning to both parties that the call may be
recorded or monitored by jail officials.   17-cr-6016, Docket # 79-
2, at ¶¶ 3-4.   In addition, each inmate phone contains a placard
that reads in bold, black capital letters "ALL CALLS ARE SUBJECT
TO MONITORING AND RECORDING."   Id. at ¶ 2.   As this Court noted
when addressing nearly the identical situation at the MCJ, "[s]uch
notifications, when part of an established jail policy of which
the inmate is aware, is sufficient to support a finding that the
inmate impliedly consented to having his calls recorded."
Anderson, 2012 WL 3648189, at *4.   Because the record here
establishes that the jail provided the defendant with verbal and
written notice that his telephone calls were subject to recording
and monitoring, there is no statutory or First Amendment violation
requiring the suppression of the calls.   Id.; see Simmons, 2016 WL
285176, at *24-25 (citing cases and finding no Article III, First,
Fourth, or Fifth Amendment violation where, like here, automated
verbal notice and written notice was provided to inmates); Colbert,
2011 WL 3360112, at *8-9 (finding no violation of First, Fourth,
Fifth, or Fourteenth Amendment).   It is therefore my Report and
Recommendation that the defendant's motion to suppress jail call
recordings (17-cr-6016, Docket # 74; 17-cr-6017, Docket # 103) be
denied.

## Conclusion

For the foregoing reasons, defendants' motions are decided as follows:

| Document Name | 17-cr-6016 | 17-cr-6017 | Disposition |
|---|---|---|---|
| Motion for Disclosure of Pre-trial Material | Docket # 25 | Docket # 39 | Granted in part and denied in part |
| Motion for Timely Disclosure of Conflicts | | Docket # 76 | Granted |
| Motion to Dismiss Count 2 | | Docket # 77 | Recommend deny |
| Motion to Change Venue | | Docket # 78 | Denied without prejudice to renew |
| Motion to Suppress Evidence (DNA) | Docket # 60 (Franks) | Docket # 80 (Franks; statements and DNA sample) | Recommend deny |
| Motion to Exclude Evidence and for Daubert Hearing | | Docket # 81 | Denied without prejudice to renew |
| Motion for Brady Disclosure and Suppression of ID Evidence | | Docket # 82 | Denied in part and denied without prejudice to renew in part |
| Motion to Suppress Evidence (jail calls) | Docket # 74 | Docket # 103 | Recommend deny |

SO ORDERED.


__/s/ Jonathan W. Feldman___
JONATHAN W. FELDMAN
United States Magistrate Judge

Dated:   April 19, 2019
         Rochester, New York

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED**, that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report and Recommendation in accordance with the above statute and Rule 59(b)(2) of the Local Rules of Criminal Procedure for the Western District of New York.[1]

The district court will ordinarily refuse to consider on *de novo* review arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance. See, e.g., Paterson-Leitch Co., Inc. v. Mass. Mun. Wholesale Elec. Co., 840 F.2d 985 (1st Cir. 1988).

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.** Thomas v. Arn, 474 U.S. 140 (1985); Wesolek v. Canadair Ltd., 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 59(b)(2) of the Local Rules of Criminal Procedure for the Western District of New York, "[w]ritten objections . . . shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for each objection, and shall be supported by legal authority." **Failure to comply with the provisions of Rule 59(b)(2) may result in the District Court's refusal to consider the objection.**

Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to the attorneys for the Plaintiff and the Defendant.

**SO ORDERED.**

                    /s/ Jonathan W. Feldman
                    Jonathan W. Feldman
                    United States Magistrate Judge

Dated:    April 19, 2019
          Rochester, New York

---

[1] Counsel is advised that a new period of excludable time pursuant to 18 U.S.C. § 3161(h)(1)(D) commences with the filing of this Report and Recommendation. Such period of excludable delay lasts only until objections to this Report and Recommendation are filed or until the fourteen days allowed for filing objections has elapsed. United States v. Andress, 943 F.2d 622 (6th Cir. 1991), cert. denied, 502 U.S. 1103 (1992); United States v. Long, 900 F.2d 1270 (8th Cir. 1990).